# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

WILLIAM F. ARIVELLA, LUCIEN F.
CARRIER, ELNORA M. CURRAN,
WILLIAM K. DEHART, JR.,
SEBASTIAN DISTEFANO,
SHARON C. DONOVAN, SHIRLEY
EASTER, ALBERT R. GAUVIN,
WILLIAM HIGGINS, CHARLOTTE
R. JOHNSTON, SHAY KENNEDY,
KENT D. KLUEBER, LUCILLE P.
LACROIX, BEVERLY J. LEVEILLE,
DELLA MARRONE, IDA R.
MCCARTHY, MARIA MURPHY,
MANUAL A. NEVES, LEWIS G.
PARHAM, JOANNE R. PAYSON,
PATRICIA A. PICARD, DOROTHY
PORTER, CAROL A. ROSS,
MARGUERITE SANTO,
ADMINISTRATRIX of the ESTATE
OF MICHAEL D. SANTO,
ROBERTA A. SIMMONS,
LEONARD SPIEGEL, and
THERESA STAPLES.

C.A. No.

        Plaintiffs,

v.

LUCENT TECHNOLOGIES INC.,
LUCENT TECHNOLOGIES
PENSION PLAN, LUCENT
TECHNOLOGIES INC. LIFE
INSURANCE PLANS, LUCENT
TECHNOLOGIES INC. LONG
TERM CARE INSURANCE PLAN,
LUCENT TECHNOLOGIES INC.
MEDICAL EXPENSE PLAN,

LUCENT TECHNOLOGIES INC.
DENTAL EXPENSE PLAN, and
LUCENT TECHNOLOGIES LONG
TERM SAVINGS AND SECURITY
PLAN,

Defendants.

# Complaint

## Nature of Action

Twenty seven former Lucent employees[1] sue their former employer and its benefit plans. They claim that Lucent breached its fiduciary duty by inducing them and other Lucent employees to accept early retirement in exchange for relatively modest benefits under an enhancement to an existing program known as the Lucent Career Transition Option Program ("LCTOP").  Lucent promoted the benefits of the enhanced LCTOP package and convinced the Plaintiffs that by remaining employed they could not hope to receive any better benefits of a similar nature and that they would receive worse benefits if they were laid off or outsourced.  But at the same time the Plaintiffs were making their decisions regarding acceptance of enhanced LCTOP, Lucent concealed from them that it and the employees' union—the Communications

---

[1] William F. Arivella, Lucien F. Carrier, Elnora M. Curran, William K. DeHart, Jr., Sebastian Distefano, Sharon C. Donovan, Shirley Easter, Albert R. Gauvin, William Higgins, Charlotte R. Johnston, Shay Kennedy, Kent D. Klueber, Lucille P. Lacroix, Beverly J. Leveille, Della Marrone, Ida R. McCarthy, Maria Murphy, Manual A. Neves, Lewis G. Parham, Joanne R. Payson, Patricia A. Picard, Dorothy Porter, Carol A. Ross, Michael D. Santo, Roberta A. Simmons, Leonard Spiegel, and Theresa Staples ("Plaintiffs").

Workers of America— had already entered into a binding agreement which would have provided the Plaintiffs with far more generous benefits under the Plans, if they stayed at Lucent and later got laid off or outsourced; indeed, had the Plaintiffs just stayed until September 2001 these benefits would have been given to them even if they left voluntarily.  These far superior benefits, described in paragraph 5 of a written Memorandum of Agreement ("Memorandum of Agreement" or "MOA") between Lucent and the CWA, are referred to here as "Paragraph 5 Benefits."  Had the plaintiffs known that outsourced or laid off employees would automatically get the Paragraph 5 benefits, they would have stayed and taken the benefits no later than September 2001 when the company announced they would be available even to those who left voluntarily.  Except for those who left like the plaintiffs, everyone else at Lucent's Merrmiack Valley plant got the Paragraph 5 benefits.  They sue here for relief under ERISA.

## Jurisdiction and Venue

1.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 (federal question) and 29 U.S.C. §1132(e)(1) (ERISA §502(e)(1)).

2.      Venue is proper in this district under 29 U.S.C. §1132(e)(2) (ERISA §502(e)(2)) and 28 U.S.C. §1391(b) (non-diversity cases).

## The Parties

3.      Plaintiff William F. Arivella of Salem, New Hampshire, was an employee of Lucent and its predecessors until 2001.  Mr. Arivella was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Arivella was a participant in the Plans at all times relevant to this action.

4.      Plaintiff Lucien F. Carrier of Pelham, New Hampshire, was an employee of Lucent and its predecessors until 2001.  Mr. Carrier was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Carrier was a participant in the Plans at all times relevant to this action.

5.      Plaintiff Elnora M. Curran of Holliston, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Ms. Curran was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Curran was a participant in the Plans at all times relevant to this action.

6.      Plaintiff William K. DeHart, Jr. of North Andover, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Mr. DeHart was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He

retired and received benefits under the Enhanced LCTOP in 2001. Mr. DeHart was a participant in the Plans at all times relevant to this action.

7.      Plaintiff Sebastian Distefano of Haverhill, Massachusetts, was an employee of Lucent and its predecessors until 2001. Mr. Distefano was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. He retired and received benefits under the Enhanced LCTOP in 2001. Mr. Distefano was a participant in the Plans at all times relevant to this action.

8.      Plaintiff Sharon C. Donovan of Lawrence, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. Donovan was a member of a collective bargaining unit represented by the CWA and CWA Local 1366. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Donovan was a participant in the Plans at all times relevant to this action.

9.      Plaintiff Shirley Easter of Gaston, North Carolina, was an employee of Lucent and its predecessors until 2001. Ms. Easter was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Easter was a participant in the Plans at all times relevant to this action.

10.      Plaintiff Albert R. Gauvin of Danville, New Hampshire, was an employee of Lucent and its predecessors until 2001. Mr. Gauvin was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. He retired

11.     Plaintiff William Higgins of Newbury, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Mr. Higgins was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Higgins was a participant in the Plans at all times relevant to this action.

12.     Plaintiff Charlotte R. Johnston of Haverhill, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Ms. Johnston was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Johnston was a participant in the Plans at all times relevant to this action.

13.     Plaintiff Shay Kennedy of Florence, South Carolina, was an employee of Lucent and its predecessors until 2001.  Ms. Kennedy was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Kennedy was a participant in the Plans at all times relevant to this action.

14.     Plaintiff Kent D. Klueber of Groveland, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Mr. Klueber was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired

and received benefits under the Enhanced LCTOP in 2001. Mr. Klueber was a participant in the Plans at all times relevant to this action.

15.     Plaintiff Lucille P. Lacroix of Salem, New Hampshire, was an employee of Lucent and its predecessors until 2001. Ms. Lacroix was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Lacroix was a participant in the Plans at all times relevant to this action.

16.     Plaintiff Beverly J. Leveille of Haverhill, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. Leveille was a member of a collective bargaining unit represented by the CWA and CWA Local 1366. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Leveille was a participant in the Plans at all times relevant to this action.

17.     Plaintiff Della Marrone of Methuen, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. Marrone was a member of a collective bargaining unit represented by the CWA and CWA Local 1366. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Marrone was a participant in the Plans at all times relevant to this action.

18.     Plaintiff Ida R. Mccarthy of Haverhill, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. McCarthy was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. She retired

19.     Plaintiff Maria Murphy of North Andover, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Ms. Murphy was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Murphy was a participant in the Plans at all times relevant to this action.

20.     Plaintiff Manual A. Neves of Northfield, New Hampshire, was an employee of Lucent and its predecessors until 2001.  Mr. Neves was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Neves was a participant in the Plans at all times relevant to this action.

21.     Plaintiff Lewis G. Parham of Merrimac, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Mr. Parham was a member of a collective bargaining unit represented by the CWA and CWA Local 1366.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Parham was a participant in the Plans at all times relevant to this action.

22.     Plaintiff Joanne R. Payson of Atkinson, New Hampshire, was an employee of Lucent and its predecessors until 2001.  Ms. Payson was a member of a collective bargaining unit represented by the CWA and CWA Local 1366.  She retired

and received benefits under the Enhanced LCTOP in 2001. Ms. Payson was a participant in the Plans at all times relevant to this action.

23.     Plaintiff Patricia A. Picard of Haverhill, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. Picard was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Picard was a participant in the Plans at all times relevant to this action.

24.     Plaintiff Dorothy Porter of Salem, New Hampshire, was an employee of Lucent and its predecessors until 2001. Ms. Porter was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Porter was a participant in the Plans at all times relevant to this action.

25.     Plaintiff Carol A. Ross of Bradford, Massachusetts, was an employee of Lucent and its predecessors until 2001. Ms. Ross was a member of a collective bargaining unit represented by the CWA and CWA Local 1366. She retired and received benefits under the Enhanced LCTOP in 2001. Ms. Ross was a participant in the Plans at all times relevant to this action.

26.     Plaintiff Michael D. Santo of Revere, Massachusetts, was an employee of Lucent and its predecessors until 2001. Mr. Santo was a member of a collective bargaining unit represented by the CWA and CWA Local 1365. He retired and received benefits under the Enhanced LCTOP in 2001. Mr. Santo was a participant

in the Plans at all times relevant to this action. Mr. Santo is represented here by his widow Marguerite Santo, Administratrix of the Estate of Michael Santo.

27.     Plaintiff Roberta A. Simmons of Bradford, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Ms. Simmons was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Simmons was a participant in the Plans at all times relevant to this action.

28.     Plaintiff Leonard Spiegel of Methuen, Massachusetts, was an employee of Lucent and its predecessors until 2001.  Mr. Spiegel was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  He retired and received benefits under the Enhanced LCTOP in 2001.  Mr. Spiegel was a participant in the Plans at all times relevant to this action.

29.     Plaintiff Theresa Staples of Salem New Hampshire, was an employee of Lucent and its predecessors until 2001.  Ms. Staples was a member of a collective bargaining unit represented by the CWA and CWA Local 1365.  She retired and received benefits under the Enhanced LCTOP in 2001.  Ms. Staples was a participant in the Plans at all times relevant to this action.

30.     Lucent Technologies, Inc. is a Delaware corporation with a principal place of business in Murray Hill, New Jersey.  Lucent maintains offices across the United States and internationally, and describes itself as "a leading global supplier of

communications networking equipment."  Lucent reported $21.3 billion in revenue in the 2001 fiscal year.

31.     The Lucent Technologies Pension Plan ("Pension Plan") is a "defined benefit plan" under §3(35) of ERISA.  It is administered and sponsored by Lucent. Upon information and belief, the Pension Plan assets exceeded $21 billion at the time this action was filed.

32.     The Lucent Technologies Inc. Life Insurance Plans ("Life Insurance Plans") are "welfare benefit plans" under §3(1) of ERISA.  They are administered and sponsored by Lucent.

33.     The Lucent Technologies Inc. Long Term Care Insurance Plan ("Long Term Care Plan") is a "welfare benefit plan" under §3(1) of ERISA.  It is administered and sponsored by Lucent.

34.     The Lucent Technologies Inc. Medical Expense Plan ("Medical Expense Plan") is a "welfare benefit plan" under §3(1) of ERISA.  It is administered and sponsored by Lucent.

35.     The Lucent Technologies Inc. Dental Expense Plan ("Dental Expense Plan") is a "welfare benefit plan" under §3(1) of ERISA.  It is administered and sponsored by Lucent.

36.     The Lucent Technologies Long Term Savings and Security Plan ("Savings and Security Plan") is a "defined contribution plan" under §3(34) of ERISA. It is administered and sponsored by Lucent.

## Statement of Facts

37.     Lucent maintained a manufacturing facility in North Andover, Massachusetts known as the Merrimack Valley Works.  At the beginning of 2001 approximately 5,500 people worked for Lucent there. The plant is now closed. From 2001 until now Lucent gave thousands of workers valuable severance packages. But several hundred workers, including the plaintiffs got left out.  They accepted far smaller benefits because the company kept the better benefits secret while they lured them out the door early with less valuable offers.

## Negotiations Between Lucent and the Union

38.     In early 2001, Lucent began negotiating with the CWA to modify the terms of the collective bargaining agreement ("Collective Bargaining Agreement") covering Merrimack Valley and other select Lucent facilities.

39.     At the time, it was widely expected that Lucent would subcontract or outsource many of the jobs at Merrimack Valley, and that the Lucent workforce there would be substantially downsized.   Lucent had announced one year earlier, in April 2000, that it intended to outsource or subcontract to other manufacturers much of the manufacturing work that it had traditionally performed in the United States.  It was generally known by early 2001 that Lucent was planning to sell or close the Merrimack Valley facility.  The outsourcing of work to contract manufacturers was already in

progress by that time at Merrimack Valley, and was apparent to employees working there.

40.     In early 2001, Lucent and the CWA entered into negotiations to address the issue of how employees would be protected in the event that there was a loss of jobs due to outsourcing, subcontracting, plant closure or sale, or involuntary termination for any reason other than disciplinary reasons.

41.     By April 2001, Lucent and the CWA had reached an agreement regarding Merrimack Valley employees.  Anticipating terminations due to outsourcing or subcontracting, closure or sale of the plant, or a weak business environment, the Company and the Union agreed upon various modifications to the Lucent Plans.  As incorporated into the Memorandum of Agreement between the two parties, these Plan modifications and additional benefits took the form of Enhanced LCTOP benefits and the far superior Paragraph 5 Benefits.

42.     Enhanced LCTOP benefits under the Memorandum of Agreement improved upon existing LCTOP benefits by increasing certain payment ceilings from $30,500 to $40,000.  Under the terms of the MOA, the Enhanced LCTOP benefits were available to eligible workers (including the Plaintiffs) in the event a surplus condition resulted from outsourcing or subcontracting at Merrimack Valley.  LCTOP was a downsizing vehicle that required resignation or other voluntary separation from Lucent.  LCTOP included a lump sum payment option, under which a separation payment was made to a departing employee based upon years of service.  Under

standard LCTOP, the maximum payment was capped at $30,500; under the enhanced version of the program put into effect in April 2001, this cap was increased to $40,000. Employees within one year of pension eligibility could also receive a "leave of absence" in order to reach eligibility.

43.     Unlike the voluntary LCTOP package described in the Memorandum of Agreement, the MOA made Paragraph 5 Benefits available to Lucent employees who were involuntarily terminated from Lucent employment ("Affected Employees"). The Paragraph 5 Benefits covered all employees who were laid off but also included employees who acquired a new employer because of manufacturing outsourcing— both events involuntarily terminated their employment with Lucent.   Paragraph 5 Benefits included all of the following components:

a.  **"Five and Five" Pension Plan Eligibility and Early Retirement Enhancement**. Amendment of the Pension Plan to credit Affected Employees with up to five years in age and/or five years in service for calculating pension eligibility and for calculating a reduction in any applicable pension discount for early retirement.

b.  **Social Security Reduction Reimbursement**.  Amendment of the Pension Plan to compensate certain Affected Employees for reduction in Social Security payments due to early retirement.

c.  **Special Pension Benefit**.  Amendment of the Pension Plan to provide to Affected Employees a special pension benefit equal to (depending on years of service) up to 234% of the Affected Employee's annual pay.

d.  **Special One-Time Lump Sum Transition Payment**. Amendment of the Pension Plan to provide Affected Employees with a $3,400 benefit.

e. **Extended Insurance Coverage for Affected Employees**. Provision of retiree insurance benefits under Lucent's Medical Expense, Dental Expense, Long Term Care and Life Insurance Plans to eligible Affected Employees. All other Affected Employees would be entitled to one year of health insurance coverage (or the cash equivalent) under one of several formulae. In addition, certain life insurance and accidental death and dismemberment insurance benefits would be continued or be available for six months.

f. **Enhanced Education, Training, Out-Placement and Relocation Benefit**. Provision of up to $5,000 in certain education, training, out-placement and relocation expenses for individuals who were otherwise entitled to up to $2,500 for such purposes.

g. **Long Term Savings and Security Plan Benefits**. Full vesting of Affected Employees in the Savings and Security Plan and, to the extent current law did not permit distribution of such funds to an Affected Employee, access to in-service withdrawal and loans as if still employed by Lucent.

44.     By early April 2001, Lucent had either decided to adopt, or was seriously considering adopting, Enhanced LCTOP and Paragraph 5 Benefits packages for Merrimack Valley. On information and belief, at the same time, Lucent was also seriously considering offering Paragraph 5 Benefits to Merrimack Valley employees on a voluntary basis.

45.     Because Paragraph 5 Benefits were much more generous to workers than those available under even Enhanced LCTOP, it was in the financial interest of Lucent and the Plans to encourage employees to accept early retirement under LCTOP rather than stay employed and wait for a chance to receive the benefits of Paragraph 5.

## The April 2001 Offer

46.     On or about April 2, 2001, Lucent told its Merrimack Valley employees that the workforce at the facility would be reduced – either through involuntary layoffs or through voluntary separation from the Company.  On that date, Lucent officially told Union representatives that more than 700 CWA members were "surplus" and at risk of being laid off.  The Union posted a "Surplus Announcement" for Union members announcing these numbers.  The Surplus Announcement stated that eligible employees would be given until April 17, 2001 to irrevocably decide whether to accept early retirement with LCTOP benefits.

47.     Lucent sent a letter dated April 2, 2001 to certain employees represented by the CWA informing them of the "surplus" of employees at Merrimack Valley and indicating the need for "some adjustment in the workforce" there.  The "standard" LCTOP benefit (with the $30,500 cap) was offered to these individuals, and the Letter gave recipients until April 17, 2001 to irrevocably accept or reject the LCTOP offer.  Employees who accepted LCTOP were to be taken "off roll" (in other words, their employment would end) no later than June 1, 2001.  The Letter stated that Lucent supervisors could provide "additional, more detailed, information" and it promised that the Company would conduct a series of "informational sessions" for employees.

## Extension of the April 2001 Offer

48.     On April 12, 2001, Lucent General Manager David J. Dunn sent a memorandum to "Merrimack Valley Manufacturing Employees" informing them that the April 17 deadline contained in the April 2 Letter had been extended.  The memorandum stated that "the Company and the CWA are engaged in negotiations, which may have an impact on current LCTOP provisions."  "In view of this," the Memorandum continued, "the election period [for LCTOP] has been extended to the close of business, May 2, 2001."  The memorandum closed by promising that "[i]f changes are negotiated to the current package, employee communication sessions will be scheduled to explain the changes before your selection must be made."

49.     On about April 19, 2001, Lucent and the CWA formalized their agreement by executing the written Memorandum of Agreement.  The MOA took the form of a contractual amendment to the Collective Bargaining Agreement, together with a series of "side letters" that clarified or amended the terms of the MOA. Paragraph 4 of the MOA implemented the Enhanced LCTOP benefits.  Paragraph 5 of the MOA implemented the Paragraph 5 Benefits.  One of the "side letters" provided that Paragraph 5 Benefits would be extended to employees who were represented by the CWA and whose employment with Lucent was involuntarily terminated (for other than disciplinary reasons), between April 2, 2001 and the completion of outsourcing at Merrimack Valley ("Tranche 3").

50.     On or about April 26, 2001, Lucent sent a second letter to employees represented by the Locals.  The April 26 Letter referenced the offer made in the April 2 Letter "to voluntarily leave Lucent Technologies under the provisions of LCTOP." It told employees that a Memorandum of Agreement between Lucent and the Union increased the LCTOP cap from $30,500 to $40,000, but it did not otherwise discuss the terms of the agreement.  As anticipated by the April 12 Memorandum, the April 26 Letter effectively rescinded any LCTOP decisions made in response to the April 2 Letter and extended the LCTOP acceptance window to May 2, 2001.  Even though the Memorandum of Agreement was already negotiated and executed, the April 26 Letter did not mention the Paragraph 5 Benefits.

51.     Because Lucent failed to provide the Plaintiffs with truthful, accurate and complete material information regarding the impact of voluntary and involuntary separation from Lucent, including the terms of the Memorandum of Agreement and details of Paragraph 5, those employees were prevented from making an adequately told decision about if and when to retire.  More than 470 individuals accepted the Enhanced LCTOP in April or May 2001 and subsequently resigned their employment with Lucent.

## The July 2001 Offer

52.     Lucent sent a third letter to union employees on or about July 12, 2001 ("July 12 Letter").  This Letter stated the need for additional reductions in the Merrimack Valley workforce, and offered the Enhanced LCTOP package once again.

The Letter told recipients that they had until July 27, 2001 to irrevocably accept or reject LCTOP.  It did not mention the Memorandum of Agreement or Paragraph 5.

53.     By the time the July 27, 2001 LCTOP acceptance window closed, Lucent had still not provided any information to any of the Plaintiffs describing the terms of Paragraph 5 or the modifications it required of the Plans.  As of July 27, it had not provided to them a copy of the Memorandum of Agreement, which amended the Collective Bargaining Agreement under which they worked as well as the Lucent Plans in which they participated.  In sum, the Company had still failed to disclose the existence of Paragraph 5.

54.     Because Lucent failed to provide employees with truthful, accurate and complete material information regarding the impact of voluntary and involuntary separation from the Company, including the terms of the Memorandum of Agreement and details of Paragraph 5, they were prevented from making an adequately told decision about if and when to retire.  More than 30 individuals accepted LCTOP on or before July 27, 2001 and subsequently resigned their employment with Lucent.

## The September 2001 Offer

55.     Having already thinned its ranks by more than 500 employees, Lucent made another separation offer in September 2001.  However, this offer was qualitatively different from the offers contained in the April 2, April 26 and July 12 Letters.  In a letter dated September 25, 2001 ("September 25 Letter"), Lucent offered

Paragraph 5 Benefits to remaining employees who would voluntarily sever their employment with the Company.  The Letter stated that "the Company and the CWA have agreed to implement a special voluntary offer," and that employees who accepted the package would receive "the enhanced benefits provided for under the Memorandum of Agreement (MOA) dated April 19, 2001 between Lucent and the CWA."  Over 1,200 Lucent employees accepted this offer, hundreds more than the number of Merrimack Valley employees Lucent had indicated were at risk of being laid off.

56.     There are no internal Plan or contractual grievance procedures applicable to or required by Plaintiffs' claims.  Further, resort by Plaintiffs to any such grievance procedures to address their claims would have been futile.

## William F. Arivella

57.     William F. Arivella worked for Lucent Technologies and its predecessors for 38 years beginning July 6, 1962.  He currently lives at 8 Glen Denin Drive, Salem, NH 03079-2301.  When he retired on June 1, 2001 at age 58, his job title was Composite Master Tool Maker and he was a member of the Local 1365 Union.

58.     By letter dated April 26, 2001 Lucent told Merrimack Valley employees like Mr. Arivella that Lucent was adjusting the facility's workforce by announcing the enhanced LCTOP voluntary separation package with an May 2 deadline to accept. The letter instructed Mr. Arivella to ask benefits-related questions to his supervisor

because Lucent had given the supervisors the information to assist employees like Mr. Arivella.   It also told him that Lucent will conduct meetings to further answer employees' questions.

59.      On April 26, 2001, Mr. Arivella was handed the enhanced LCTOP benefit letter and package from his Supervisor, Robert Gossens.  Mr. Arivella read the letter and immediately followed the letter's instructions by speaking with Mr. Gossens, in his cubicle with two other supervisors, Ron Hudson and Pat Patel.  Mr. Arivella asked several times over the next four days for an extension of the May 2 deadline to get more time to make his decision, and if there was a possibility of a better package being offered.  The supervisors told him this was the best package he could get and there would be no extension of time to think it over. At one point, Mr. Arivella also asked Mr. Gossens if he could take the package and continue to work until his Anniversary date of July 6 so he could get his 3% pension increase, and if he could rollover the lump sum to avoid tax liability.  Mr. Gossens incorrectly told Mr. Arivella that he couldn't continue working after taking the enhanced LCTOP even though the package contained a provision to do just that. Also Mr. Gossens told Mr. Arivella that no one in their department could rollover the LCTOP lump sum because no one in that department was being laid off and only those people who took the benefit to save other's jobs could roll over their money.

60.      Later that same day and after his first meeting with the supervisors, Mr. Arivella went to the union hall and spoke with Union Steward Bruce Bennett and

Union Treasurer Verna Hasbrook.  Mr. Arivella asked them if there was a possibility of a better benefit package coming out than the LCTOP or if there were any additional benefits he would be eligible for.  They told him nothing else was forthcoming.

61.     Mr. Arivella retired on June 1, 2001, feeling confident in light of the official assurances he received that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did.

62.     Mr. Arivella would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. But he didn't want to miss out on the severance package because he was told that there was no chance for anything better. Mr. Arivella felt rushed into making this life changing decision with only 4 business days to get answers to all his questions before the May 2 deadline to accept. So Mr. Arivella retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Arivella got a lump sum of approximately $25,000 after taxes.

63.     The first time Mr. Arivella heard about the better Paragraph 5 benefits coming out was about December 2001, at the Academy Lanes Bowling Alley in Haverhill, MA.  He and his friend Harold Duffin, were told about the better package by another toolmaker, Richard King who said he retired with Paragraph 5 benefits worth over $100,000. Mr. Arivella then contacted Paul Fici, whose information was

given to him by former coworker Sal Linzetto.  Mr. Fici told Mr. Arivella about his

lawsuit and a meeting with Gesmer & Updegrove.  In 2005, Mr. Arivella attended the

meeting in Northern Essex Community College held by Gesmer & Updegrove to

explain the *Fici v. Lucent*[2] lawsuit.  Mr. Arivella was later told that class certification

was denied.  So in December 2006, Mr. Arivella retained Moukawsher & Walsh, LLC

to represent him in this lawsuit.

## Lucian F. Carrier

64.     Lucien F. Carrier worked for Lucent Technologies and its predecessors

for 41 years beginning August 16, 1959.  He currently lives at 133 Old Gage Hill

Road, North, Pelham, NH 03076.    When he retired on June 1, 2001 at age 62, his

job title was Group 2 (painter) and he was a member of the Local 1365 Union.

65.     Mr. Carrier was classified as a Trades employee because he was a

painter, so Mr. Carrier and other Trades employees were not given the first LCTOP

offer  dated April 2, 2001.  Instead they received the April 26, 2001 letter increasing

the LCTOP cap from $30,500.00 to $40,000.00 with a deadline of May 2, 2001 to

decide.  This letter told Merrimack Valley employees like Mr. Carrier that the

workforce at the facility would be reduced, and announced the enhanced LCTOP

voluntary separation package with an May 2 deadline to accept.  The letter instructed

Mr. Carrier to ask benefits-related questions to his supervisor because Lucent had

---

[2] *Fici v. Lucent*, Docket No. 02-10536-RCL, U.S. District Court for the District of Massachusetts.

given supervisors the information to assist employees like Mr. Carrier. It also told him that Lucent will conduct meetings to further answer employees' questions.

66.     By this time, Mr. Carrier was hearing rumors and reading newspaper articles talking about outsourcing, Chapter 11 and the plant closing. So shortly after receiving the letter, Mr. Carrier followed its instructions and spoke separately with his Supervisors, Function Managers, Bob Bartley and Les Schatler.  When Mr. Carrier asked them about the LCTOP and any other possible package, they told him there wouldn't be another package offered because Lucent was going to layoff surplus employees and these employees would get no benefits; they said this was a one-time offer, that the company will never offer another package, and that it was the best deal he would ever receive.

67.     Because the letter did not give details about the meetings, Mr. Carrier who worked at that time in a modular building disconnected from the plant, never got notice of the scheduled meetings, and so he never attended one.  But, Mr. Carrier felt that he had all of his questions answered by the people he was instructed to speak to.

68.     Mr. Carrier retired on June 1, 2001, feeling confident in light of the official assurances he received that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Carrier never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

69.     Mr. Carrier would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.  But he was afraid to be laid off without medical coverage or any package after serving Lucent for 41 years. So Mr. Carrier retired and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Carrier got a lump sum of $26,000 after taxes.

70.     The first time Mr. Carrier heard about the better Paragraph 5 benefits coming out was from his wife who received the announcement of Paragraph 5 benefits in September 2001. But Mr. Carrier didn't find out all the details of the Paragraph 5 benefits until he attended a meeting in 2005 held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members.  After the meeting with Gesmer & Updegrove he waited for the outcome on class certification. In 2006, he was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Mr. Carrier retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

## Elnora M. Curran

71.     Elnora Michelle Curran worked for Lucent Technologies and its predecessors for 21 years beginning January 2, 1980.  She currently lives at 100 Summer Street, Apartment 114, Holliston, MA 01746.  When she retired on June 1, 2001 at age 60, her job title was PL II Grade and she was a member of the Local 1365 Union.

72.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Curran that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Curran received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Ms. Curran to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Curran.  It also told her that Lucent will conduct meetings to further answer employees' questions.

73.     Ms. Curran was out on sick leave when she received the announcements, and so she was not at work on the day her department attended a meeting for office employees in Lucent's auditorium with speakers from Human Resources.  But she was later told by coworkers that they explained the LCTOP benefits and tried to answer questions. She was also told that the speakers told everyone this was the only package, there would be no others and the plant was downsizing.

74.     Ms. Curran retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Curran never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

75.     Ms. Curran would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible. But she was afraid to be laid off without any benefit package after serving Lucent for over 21 years. So Ms. Curran retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Curran got a lump sum of approximately $12,000 after taxes.

76.     The first time Ms. Curran heard about the better Paragraph 5 benefits coming out was in 2001 from people still working at Lucent.  But Ms. Curran didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting held at Northern Essex Community College in 2005 by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied. So in January 2007, Ms. Curran retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## William K. DeHart, Jr.

77.     William K. DeHart worked for Lucent Technologies and its predecessors for 29 years beginning May 17, 1972.   He currently lives at 222 Brentwood Circle, North Andover, MA 01845.   When he retired on June 1, 2001 at age 55, his job title was Tier 5 Senior Drafting Analyst and he was a member of the Local 1366 Union.

78.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. DeHart that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. DeHart received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Mr. DeHart to ask benefits-related questions to his supervisor because Lucent had given the supervisors the information to assist employees like Mr. DeHart. It also told him that Lucent will conduct meetings to further answer employees' questions.

79.     In April, Mr. DeHart followed the letters' instructions and attended a meeting for first-shift employees in Lucent's auditorium at which Sheila Landers and Natasha Glendon-Crossley of Human Resources spoke about the LCTOP package and answered employees' questions.  At this meeting, Lucent Officials didn't tell Mr. DeHart or the others that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  In fact, they told Mr. DeHart and the other attendees just the opposite, that the LCTOP was the last package and the plant might close, so they had better accept the LCTOP or there was a good chance they would be let go without any benefit package.

80.     Shortly before the deadline, Mr. DeHart met with Betty Ann Comeau to sign the enhanced LCTOP acceptance paperwork.  Mr. DeHart asked Ms. Comeau

about the possibility of a better offer coming out.  Ms. Comeau told him this was the only offer.

81.      Mr. DeHart retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did or he could have been laid off without any benefit package.  Mr. DeHart never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

82.      Mr. DeHart would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. But he was afraid to be laid off without any benefit package after serving Lucent for 29 years. So Mr. DeHart retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits.  Instead under the enhanced LCTOP, Mr. DeHart got to work on call so he could receive a pension increase and a lump sum of less than $20,000 after taxes.

83.      The first time Mr. DeHart heard about the better Paragraph 5 benefits coming out was in November 2001 from former coworker Dick Kulanda and his wife Sharon at the Knights of Columbus in North Andover Massachusetts. Later, Mr. DeHart attended several other meetings held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members.  Mr. DeHart felt cheated by the company he served since college and a union he paid dues to for piece of mind.  After the meetings with Gesmer & Updegrove he waited for the outcome on class

certification.  In 2006, he was told by Gesmer & Updegrove that class certification

was denied.  So in December 2006, Mr. DeHart retained Moukawsher & Walsh, LLC

to represent him in this lawsuit.

## Sebastian Distefano

84.     Sebastian   Distefano   worked   for   Lucent   Technologies   and   its

predecessors for 37 years beginning May 14, 1964.  He currently lives at 15 Keeley

Street, Haverhill, MA 01830.  When he retired on August 10, 2001 at age 58, his job

title was Level II Layout Operator and he was a member of the Local 1365 Union.

85.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Mr. Distefano that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Mr. Distefano received another letter dated April 26 regarding a new enhanced

LCTOP benefit with a May 2  deadline to accept.  The letters instructed Mr.

Distefano to ask benefits-related questions to his supervisor because Lucent had given

the supervisors the information to assist employees like Mr. Distefano. It also told

him that Lucent will conduct meetings to further answer employees' questions.

86.     After reading the announcement and hearing rumors about better

benefits, Mr. Distefano immediately followed the letters' instructions by speaking with

his Department Head Richard Rurak, in Mr. Rurak's office.  Mr. Distefano asked Mr.

Rurak if there was a possibility of a better package being offered.  Mr. Rurak told him

he did not know about any other packages than this one.

87.     Before the deadline, Mr. Distefano spoke with several union stewards, whose names he cannot remember.   Mr. Distefano asked them if there was a possibility of a better benefit package coming out that he should wait for.  They told him there won't be any other packages, this was the last one.

88.     In mid-April Mr. Distefano followed the letters' instructions and attended a meeting for first-shift employees in Lucent's auditorium at which Sheila Landers and Natasha Glendon-Crossley of Human Resources spoke about the LCTOP package and answered employees' questions.  At this meeting, Lucent Officials didn't tell Mr. Distefano or the others that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  In fact, they told Mr. Distefano and the other attendees just the opposite, that the LCTOP was the last package and the plant might close, so they had better accept the LCTOP or there was a good chance they would be let go without any benefit package.

89.     Mr. Distefano retired on August 10, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Distefano never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

90.     Mr. Distefano would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. But he was afraid to be laid off without any benefit package after serving Lucent for 37 years. So Mr. Distefano retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Distefano got to work on call until he received a pension increase and a lump sum of $24,000 after taxes.

91.     The first time Mr. Distefano heard about the better Paragraph 5 benefits coming out was in September 2001 from his wife who was still employed.  In 2006, Mr. Distefano spoke with former Lucent employee and co-plaintiff Ida McCarthy, who told Mr. Distefano about class certification being denied in the *Fici v. Lucent* suit and signing up individually. So in February 2007, Mr. Distefano retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

### Sharon C. Donovan

92.     Sharon C. Donovan worked for Lucent Technologies and its predecessors for 34 years beginning January 7, 1967.  She currently lives at 2 Martha Lane, Lawrence MA 01843.  When she retired on June 1, 2001 at age 54, her job title was Senior Materials Management Analyst Master Scheduler and she was a member of the Local 1366 Union.

93.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Donovan that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Ms. Donovan received another letter dated April 26 regarding a new enhanced

LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Donovan

to ask benefits-related questions to her supervisor because Lucent had given the

supervisors the information to assist employees like Ms. Donovan. It also told her

that Lucent will conduct meetings to further answer employees' questions.

94.       Immediately after receiving the letter, Ms. Donovan followed the

letters' instruction and spoke with her supervisor Alfreda Brewer in Room 3M of

Lucent's Building 20, about the announcement.  She asked Ms. Brewer if the company

was discussing the possibility of any other packages coming out.  Ms. Brewer

responded to Ms. Donovan that the company told her she was not to discuss this

with anyone, which was contrary to what the letter said. Ms. Brewer did not direct her

to anyone else.

95.       After speaking with Ms. Brewer, Ms. Donovan spoke several times

with Local 1366 Union President Marci Vincent, either on the Lucent campus or at

the Union office.  Ms. Donovan repeatedly asked about the possibility of another

package.  In response to her inquiries, Ms. Vincent told her, this is the only package,

that Ms. Donovan should take it because if she didn't she might lose her health

benefits and more; that there was a good chance the plant would close and even this

package might not come around again so she could be out of the job without any

benefit package.

96.     In the middle of April, she attended a meeting for first-shift employees in Lucent's auditorium at which Sheila Landers and Natasha Glendon-Crossley of Human Resources spoke about the LCTOP package and answered employees' questions.  At this meeting, Lucent didn't tell Ms. Donovan or the others that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  In fact, they told Ms. Donovan and the other attendees just the opposite, that the LCTOP was the only package and the plant might close, so they had better accept the LCTOP or there was a good chance they would be let go without any benefit package.

97.     On April 30, 2001, Ms. Donovan met with Natasha Glendon-Crossley of Human Resources in Room 2X-64 of Lucent's Building 20 to sign the enhanced LCTOP acceptance paperwork. Ms. Glendon-Crossley didn't tell Ms. Donovan that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

98.     Ms. Donovan retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Donovan never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

99.     Ms. Donovan would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a

voluntary Paragraph 5 offer was possible.  But she was afraid to be laid off without any benefit package after serving Lucent for over 34 years. So Ms. Donovan retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Donovan got a lump sum of approximately $20,000 after taxes.

100.    The first time Ms. Donovan heard about the better Paragraph 5 benefits coming out was in November 2001 at a meeting of 100 other former employees at the Knights of Columbus in North Andover MA.  At the meeting, Sharon Kalenda told Ms. Donovan and others about the Paragraph 5 benefits. Ms. Donovan attended several other meetings held by Gesmer & Updegrove explaining the *Fici v. Lucent* lawsuit and its pending class certification.  After the meetings with Gesmer & Updegrove she and others like her waited for the outcome on class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. Donovan retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Shirley Easter

101.    Shirley Easter worked for Lucent Technologies and its predecessors for 34 years beginning January 23, 1967.  She currently lives at 213 River Road, Gaston, NC 27832.  When she retired on June 1, 2001 at age 53, her job title was PL2E Inspector and she was a member of the Local 1365 Union.

102.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Easter that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Easter received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letter instructed Ms. Easter to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Easter. It also told her that Lucent will conduct meetings to further answer employees' questions.

103.     Immediately after receiving the first letter in the 1st week of April, Ms. Easter followed the letters' instruction and spoke with her supervisor Bharat Patel. She told Mr. Patel that she would like to stay on working until July 2002 so she could retire with 35 years of service at 55 years old.  He told her she better leave now and take the offer because he was told there wouldn't be anything else and people could lose their jobs with no package later on.

104.     After receiving the April 26 letter, Ms. Easter went back to Mr. Patel and asked about the possibility of another package.  Mr. Patel again encouraged her to leave now with the offer, if she stayed she could be forced to leave with no package because, as he was told, the company isn't offering any better packages. She asked to be kept informed if there was any new information about other packages and he said he would let her know if he heard anything.

105.     In the middle of April, she attended a meeting for second-shift employees in Lucent's auditorium at which Sheila Landers and Natasha Glendon-Crossley from Human Resources, Department Supervisor Bharat Patal, Department Chief Al Krushwitz and Plant Manager Dave Dunn spoke about the LCTOP package and answered employees' questions.  At this meeting, Lucent did not tell Ms. Easter or the others that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  In fact, they told Ms. Easter and the other attendees just the opposite, that the LCTOP was the only package.

106.     Shortly before the May 2 deadline to accept, Ms. Easter met with her Supervisor Bharat Patel to sign the enhanced LCTOP acceptance paperwork.  She asked him again about the possibility of another package and he responded that he had not heard anything else. Mr. Patel didn't tell Ms. Easter that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

107.     Ms. Easter retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Easter never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

108.    Ms. Easter would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact she had always wanted to retire in July 2002 with 35 years of service at 55 years old.  But she was afraid to be laid off without any benefit package after serving Lucent for over 34 years. So Ms. Easter retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Easter got a lump sum of approximately $23,000 after taxes.

109.    The first time Ms. Easter heard about the better Paragraph 5 benefits coming out was in September 2001 from a Union steward and then again in October 2001 from John Wright an former coworker who got the Paragraph 5 benefits.  But Ms. Easter didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she heard from another former coworker about the *Fici v. Lucent* lawsuit and its pending class certification. In 2006, she found out that class certification was denied.  So in December 2006, Ms. Easter retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Albert R. Gauvin

110.    Albert R. Gauvin worked for Lucent Technologies and its predecessors for 41 years beginning June 13, 1960.  He currently lives at 198 Main Street, Danville, NH 03819.  When he retired on July 30, 2001 at age 61, his job title was Process Analyst and he was a member of the Local 1365 Union.

111.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Gauvin that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Gauvin received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letter instructed Mr. Gauvin to ask benefits-related questions to his supervisor because Lucent had given the supervisors the information to assist employees like Mr. Gauvin. It also told him that Lucent will conduct meetings to further answer employees' questions.

112.    After reading the letters, Mr. Gauvin followed the instruction by speaking with his Supervisor Jack P. Verrette.  Mr. Gauvin asked Mr. Verrette if there was a possibility of a better package being offered.  Mr. Verrette told him no, that this package was it and he better take it because he could lose his job and get nothing.  Mr. Verrette retired shortly after.

113.    Before the May 2 deadline to accept,  Mr. Gauvin went to his Supervisor again, this time he spoke with Michael S. Bistany who replaced Jack P. Verrette.  He asked Mr. Bistany if there was the possibility of a better package coming out and Mr. Bistany also told him no, and to take this package while you can.

114.    Lastly, Mr. Gauvin attended a meeting for second-shift employees in Lucent's auditorium at which Plant Manager David Dunn and Head of Human Resources Sheila Landers spoke about the LCTOP package and answered employees' questions. At this meeting, Lucent did not tell Mr. Gauvin or the others that the

39

MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Mr. Gauvin remembers two or three people asking about the possibility of a better offer in the near future.  Both Mr. Dunn and Ms. Landers told them all that this was the only package and they better take it while its being offered or they could be let go without any benefit package.

115.    By the deadline to accept, Mr. Gauvin signed his paperwork and handed it over to his supervisor, Michael S. Bistany.  Mr. Bistany didn't tell Mr. Gauvin that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

116.    Mr. Gauvin retired on July 3, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Gauvin never received a copy of the MOA containing the Paragraph 5 benefits from Lucent.  It wasn't until 2005, that he got a copy of the MOA from a former Union Steward.

117.    Mr. Gauvin would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. But he was afraid to be laid off  without any benefit package after serving Lucent for 41 years. So Mr. Gauvin retired based on

118.     The first time Mr. Gauvin heard about the better Paragraph 5 benefits coming out was in September 2001 from a former coworker in the same pay grade as Mr. Gauvin who got $98,000.  Later, Mr. Gauvin spoke with former Lucent employee Maddie Carrier, who told Mr. Gauvin about the *Fici v. Lucent* lawsuit and its pending class action status.  Mr. Gauvin also attended two meetings held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members.  After the meetings with Gesmer & Updegrove he waited for the outcome on class certification.  In 2006, he was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Mr. Gauvin retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

## William Higgins

119.     William  Higgins worked for Lucent Technologies and its predecessors for 24 years beginning on June 30, 1977.  He currently lives at 13 Highfield Road, Newbury, MA 01951.  When he retired on March 8, 2002 at age 49, his job title was Fork Truck Driver, Storeroom and he was a member of the Local 1365 Union.

120.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Higgins that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Mr. Higgins received another letter dated April 26 regarding a new enhanced LCTOP

benefit with a May 2  deadline to accept. The letters instructed Mr. Higgins to ask

benefits-related questions to his supervisor because Lucent had given the supervisors

the information to assist employees like Mr. Higgins. It also told him that Lucent will

conduct meetings to further answer employees' questions.

121.     After receiving the letters, Mr. Higgins followed the instruction and

spoke with his Supervisor Cheryl Kyricopoulos.  He asked Ms. Kyricopoulos if there

was the possibility of a better package offered.  Ms. Kyricopoulos told Mr. Higgins

that this was the only offer and he would be smart if he took it and left because if he

stayed he could be laid off with no package because of the downsizing.

122.     In the middle of April,  Mr. Higgins attended a meeting for second-

shift employees in Lucent's auditorium with speakers Sheila Landers and Natasha

Glendon-Crossley from Human Resources.  They explained the LCTOP benefits and

tried to answer questions. They never mentioned that the MOA offered much more

generous benefits under Paragraph 5 if employees did not accept this voluntary

LCTOP offer and were later laid off or outsourced. Instead, they said there will be no

other package, this was a one-time offer.

123.     Shortly before the May 2 deadline to accept, Mr. Higgins met with

Natasha Glendon-Crossley of Human Resources to sign the enhanced LCTOP

acceptance paperwork.  Ms. Glendon-Crossley didn't tell Mr. Higgins that the MOA

offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

124.     Mr. Higgins accepted the enhanced LCTOP in May 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that he made the right decision retiring when he did or he could have been laid off without any benefit package.  Mr. Higgins never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

125.     Mr. Higgins would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact, Mr. Higgins chose the enhanced LCTOP option to continue to work until March 2002 in order to gain more age and years of service toward pension eligibility.  But he was afraid to be laid off without any benefit package after serving Lucent for over 24 years. So Mr. Higgins retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Higgins got to work until he was pension eligible in 2002 using up his $40,000 lump sum as payments over that time.

126.     The first time Mr. Higgins heard about the better Paragraph 5 benefits coming out was the end of 2001 from fellow employees.  But Mr. Higgins didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until he attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its

pending class certification.  In 2006, he was told by Gesmer & Updegrove that class

certification was denied. So in December 2006, Mr. Higgins retained Moukawsher &

Walsh, LLC to represent him in this lawsuit.

## Charlotte R. Johnston

127.     Charlotte R. Johnston worked for Lucent Technologies and its

predecessors for 30 years beginning April 28, 1971.  She currently lives at 12 Oliver

Street, Haverhill, MA 01832.  When she retired on July 7, 2001 at age 61, her job title

was Assembler Lightwave Bay Area and she was a member of the Local 1365 Union.

128.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Ms. Johnston that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Ms. Johnston received another letter dated April 26 regarding a new enhanced

LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Johnston

to ask benefits-related questions to her supervisor because Lucent had given the

supervisors the information to assist employees like Ms. Johnston. It also told her that

Lucent will conduct meetings to further answer employees' questions.

129.     After receiving the letters, Ms. Johnston followed the instruction and

spoke with her supervisor Roger Daniels of the Light Wave Department several

times.  She asked on several occasions if this was the best time to retire because she

was 61 years old and could continue working another year until her social security

started.  She also asked if there was the possibility of another package being offered.

Mr. Daniels told her that with her service it was the best time to retire, because there wouldn't be anything after this package and the company would take away health benefits or worse lay people off.

130.    Ms. Johnston and others in her department did not attend any of the meetings Lucent held explaining the LCTOP benefit,  because they were never notified of a meeting.  But Ms. Johnston did hear about a meeting after the fact from other employees, who told her that Sheila Landers told the attendees that there would be no other package offered after the LCTOP, and they should take this or risk being laid off without any benefit package.

131.    Shortly before the May 2 deadline to accept, Ms. Johnston met with her Supervisor Roger Daniels to sign the enhanced LCTOP acceptance paperwork. Mr. Daniels didn't tell Ms. Johnston that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

132.    Ms. Johnston retired on July 7, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Johnston never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

133.    Ms. Johnston would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a

voluntary Paragraph 5 offer was possible. In fact she wanted to retire in another year

when she turned 62 in order to start her social security benefits.  But she was afraid to

be laid off without any benefit package after serving Lucent for over 30 years. So Ms.

Johnston retired based on Lucent's assurances and lost out on the more lucrative

Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Johnston got lump

sum of approximately $23,000 after taxes.

134.     The first time Ms. Johnston heard about the better Paragraph 5

benefits coming out was in September 2001 from employees who took the offer.  But

Ms. Johnston didn't learn about all the details of the Paragraph 5 benefits offered in

the MOA until later when she heard about the *Fici v. Lucent* lawsuit and its pending

class certification Gesmer & Updegrove.  In 2006, she was told by Gesmer &

Updegrove that class certification was denied.  So in December 2006, Ms. Johnston

retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Shay Kennedy

135.     Shay  Kennedy worked for Lucent Technologies and its predecessors

for 22 years beginning on October 1, 1979.  She currently lives at 1810 Wax Myrtle

Drive, Florence, SC 29501.  When she retired on June 1, 2001 at age 58, her job title

was Level II Warehouse and she was a member of the Local 1365 Union.

136.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Ms. Kennedy that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Ms.

Kennedy received another letter dated April 26 regarding a new enhanced LCTOP

benefit with a May 2 deadline to accept. The letters instructed Ms. Kennedy to ask

benefits-related questions to her supervisor because Lucent had given the supervisors

the information to assist employees like Ms. Kennedy. It also told her that Lucent will

conduct meetings to further answer employees' questions.

137.     Shortly before the May 2 deadline, Ms. Kennedy followed the letters'

instruction and spoke with her Supervisor Cheryl Kyricopoulos.  Ms. Kennedy just

finished a costly divorce and asked Ms. Kyricopoulos who had recently been through

a costly divorce herself, if  Ms. Kyricopoulos was going to take the LCTOP.  Ms.

Kyricopoulos told her she would take the offer because the company's loan was due

in September and the only way to afford satisfying it was by reducing overhead and if

they couldn't do that the plant will close. She told Ms. Kennedy to take the package

because if the plant closed she wouldn't get anything and in fact would be out of the

job and lose all her benefits.

138.     Right before she retired, she spoke with several coworkers about the

LCTOP offer.  She spoke with Jose Frank Cruz who told her he heard from Lucent

officials that the LCTOP was the only package.  She also heard from one of the truck

drivers who spoke with the Union President and was told they are lucky their are

getting anything and they better take it and run.

139.     Ms. Johnston retired on July 7, 2001, feeling confident in light of the

official assurances that there was no possibility of a  better package than the LCTOP

and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Kennedy never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

140.     Ms. Kennedy would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact, Ms. Kennedy would have continued working because she had recently ended a costly divorce and needed the money to cover legal fees and general living expenses.  But she was afraid to be laid off without any benefit package after serving Lucent for over 22 years. So Ms. Kennedy retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Kennedy got a lump sum of approximately $16,000 after taxes.

141.     The first time Ms. Kennedy heard about the better Paragraph 5 benefits coming out was in September 2001 from her friend, Linda Frazzini who took the offer.  But Ms. Kennedy didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification. In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006,  Ms. Kennedy retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Kent D. Klueber

142.     Kent D. Klueber worked for Lucent Technologies and its predecessors for 41 years beginning June 24, 1960.  He currently lives at 14 Hillview Drive, Groveland, MA 01834.  When he retired on June 30, 2001 at age 59, his job title was P&M (Machine Setter layout) and he was a member of the Local 1365 Union.

143.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Klueber that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Klueber received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Mr. Klueber to ask benefits-related questions to his supervisor because Lucent had given the supervisors the information to assist employees like Mr. Klueber. It also told him that Lucent will conduct meetings to further answer employees' questions.

144.     In mid-April, Mr. Klueber attended a meeting for first-shift employees in Lucent's auditorium at which CWA President Joseph Kanan and Head of Human Resources Sheila Landers spoke about the LCTOP package and answered employees' questions.  At no time, did either Ms. Landers or Mr. Kanan tell the attendees that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  In fact, at this meeting, Mr. Klueber remembers several people asking if this was the final offer. And Ms. Landers responded emphatically that this was the final offer and if people

didn't accept the LCTOP they could lose their jobs with no package and more than likely lose their medical coverage.

145.    After the meeting, Mr. Klueber followed the announcement's instruction by speaking with his Supervisor Roger Lawson.  Mr. Klueber asked Mr. Lawson if there would be a better offer, if the LCTOP was the best.  Mr. Lawson told him the LCTOP was the only package and if he didn't take it he could be laid off without any benefit package.

146.    Lastly, Mr. Klueber met with Human Resources Betty Comeau to sign the acceptance paperwork.    Ms. Comeau told him this was it, there is not another package coming along.  Ms. Comeau did not tell Mr. Klueber that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

147.    Mr. Klueber retired on May 31, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Klueber never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

148.    Mr. Klueber would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.   Mr. Klueber didn't intend to retire until 2004 or 2005 when his wife was ready to retire.  But he was afraid to be laid off

without medical coverage or any package after serving Lucent for 41 years. So Mr. Klueber retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Klueber got to work until June 30 and a lump sum of $24,000 after taxes.

149.     The first time Mr. Klueber heard about the better Paragraph 5 benefits coming out was in September 2001 from employees, some of whom were getting $100,000 with less years of service than Mr. Klueber.  But Mr. Klueber didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until he attended meetings held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit.  After the meeting with Gesmer & Updegrove he waited for the outcome on class certification. In 2006, he was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Mr. Klueber retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

### Lucille P. Lacroix

150.     Lucille  P.  Lacroix  worked  for  Lucent  Technologies  and  its predecessors  for  26  years  beginning  December  23,  1974.   She  currently  lives  at  7 Beverly Avenue, Salem, NH 03079.  When she retired on June 1, 2001 at age 62, her job title was P2E Storeroom and she was a member of the Local 1365 Union.

151.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Lacroix that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Ms. Lacroix received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Ms. Lacroix to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Lacroix. It also told her that Lucent will conduct meetings to further answer employees' questions.

152.     After receiving the letters, Ms. Lacroix followed the letters' instruction and spoke with her Supervisor Cheryl Kyricopoulos. She asked if there was the possibility of another package being offered. Ms. Kyricopoulos told her that there wouldn't be anything after this package because the company may be in bankruptcy in September if the loan isn't satisfied and she could lose her job and her benefits.

153.     Ms. Lacroix and others in her department attended a meeting for second-shift employees in Lucent's auditorium with speaker, Sheila Landers from Human Resources. Ms. Landers explained the LCTOP benefits and tried to answer questions. Ms. Landers never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, she told everyone this was the only package, there would be no others.

154.     Shortly before the May 2 deadline to accept, Ms. Lacroix met with a Human Resource representative, whose name she doesn't recall to sign the enhanced LCTOP acceptance paperwork. The representative didn't tell Ms. Lacroix that the

MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

155.    Ms. Lacroix retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Lacroix never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

156.    Ms. Lacroix would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact, if she had waited to retire she would have received a raise in her pension.  But she was afraid to be laid off without any benefit package after serving Lucent for over 26 years. So Ms. Lacroix retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Lacroix got a lump sum of approximately $24,000 after taxes.

157.    The first time Ms. Lacroix heard about the better Paragraph 5 benefits coming out was in September 2001 at the Knights of Columbus meeting from employees who took the offer.  But Ms. Lacroix didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she heard about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer &

Updegrove that class certification was denied. So in December 2006, Ms. Lacroix

retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Beverly J. Leveille

158.     Beverly Leveille worked for Lucent Technologies and its predecessors

for 42 years beginning November 7, 1958. She currently lives at 830 Amesbury Road,

Haverhill, MA 01830. When she retired on July 2, 2001 at age 64, her job title was

Senior Material Management Analyst Tier 5 and she was a member of the Local 1366

Union.

159.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Ms. Leveille that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept. Later,

Ms. Leveille received another letter dated April 26 regarding a new enhanced LCTOP

benefit with a May 2 deadline to accept. The letters instructed Ms. Leveille to ask

benefits-related questions to her supervisor because Lucent had given the supervisors

the information to assist employees like Ms. Leveille. It also told her that Lucent will

conduct meetings to further answer employees' questions.

160.     In April, Ms. Leveille and others in her department attended a meeting

for second-shift employees in Lucent's auditorium with speaker, Sheila Landers from

Human Resources and Plant Manager David Dunn. They explained the LCTOP

benefits and answed questions. They never mentioned that the MOA offered much

more generous benefits under Paragraph 5 if employees did not accept this voluntary

LCTOP offer and were later laid off or outsourced. Instead, they told everyone this was the only package, there would be no others.

161.    Shortly before the May 2 deadline to accept, Ms. Leveille met with a Human Resource representative, she recalls was either Betty Comeau or Carolyn Chambly to sign the enhanced LCTOP acceptance paperwork.  The representative didn't tell Ms. Leveille that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

162.    Ms. Leveille retired on July 2, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Leveille never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

163.    Ms. Leveille would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact she would have continued working for as long as possible because she was widow living off only her income and needed the money.  But she was afraid to be laid off without any benefit package after serving Lucent for over 42 years. So Ms. Leveille retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Leveille got a lump sum of approximately $23,000 after taxes.

164.    The first time Ms. Leveille heard about the better Paragraph 5 benefits coming out was in November 2001 at a meeting at the Knights of Columbus in North Andover with other retirees.  But Ms. Leveile didn't learn about the details of the Paragraph 5 benefits until she later attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. Leveille retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

### Della Marrone

165.    Della Marrone worked for Lucent Technologies and its predecessors for 38 years beginning August 9, 1963.  She currently lives at 34 Alvin Street, Methuen, MA 01844.  When she  retired on November 9, 2001 at age 59, her job title was Senior Materials Management Analyst  Tier 5 Master Scheduler and she was a member fo the Local 1366 Union.

166.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Marrone that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Marrone received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Marrone to ask benefits-related questions to her supervisor because Lucent had given the supervisors

the information to assist employees like Ms. Marrone. It also told her that Lucent will conduct meetings to further answer employees' questions.

167.     Ms. Marrone and others in her department attended a meeting for office employees in Lucent's auditorium with speaker, Sheila Landers from Human Resources and Plant Manager David Dunn.  They explained the LCTOP benefits and tried to answer questions. They never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, they told everyone this was the only package, there would be no others, that they would save others from being laid off later on if they took this package and left now.

168.     After the meeting with Ms. Landers and Mr. Dunn, Ms. Marrone attended a department meeting with Supervisors Butch Bouchard and Joe Longey. Mr. Bouchard and Mr. Longey reiterated that this package was it, and if they didn't take it they could be laid off without any benefit package.

169.     At 9:30am on April 28, 2001, Ms. Marrone met with Human Resources Representative Betty Comeau to sign the enhanced LCTOP acceptance paperwork. Ms. Comeau didn't tell Ms. Marrone that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

170.     Ms. Marrone agreed to retire on November 9, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than

57

the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package. Ms. Marrone never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

171.     Ms. Marrone would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible. But she was afraid to be laid off without any benefit package after serving Lucent for over 38 years. So Ms. Marrone retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Marrone got a lump sum of approximately $23,000 after taxes.

172.     The first time Ms. Marrone heard about the better Paragraph 5 benefits coming out was in 2001 at a meeting at the Knights of Columbus in North Andover with other retirees. But Ms. Marrone didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification. In 2006, she was told by Gesmer & Updegrove that class certification was denied. So in December 2006, Ms. Marrone retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Ida R. McCarthy

173.     Ida R. McCarthy worked for Lucent Technologies and its predecessors

for 30 years beginning September 3, 1970.  She currently lives at 80 Edgewood

Avenue, Haverhill, MA 01832.  When she retired on June 2, 2001 at age 61, her job

title was P2E Production Senior Operator and she was a member of the Local 1365

Union.

174.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Ms. McCarthy that the workforce at the facility would be reduced, and announced

the LCTOP voluntary separation package with an April 17 deadline to accept.  Later,

Ms. McCarthy received another letter dated April 26 regarding a new enhanced

LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. McCarthy

to ask benefits-related questions to her supervisor because Lucent had given the

supervisors the information to assist employees like Ms. McCarthy. It also told her

that Lucent will conduct meetings to further answer employees' questions.

175.     A week after receiving the first letter, Ms. McCarthy spoke with her

union steward Rick Seaman about the announcement.  She asked him if there was a

possibility of another offer coming out in the next year because by then she would be

62. Mr. Seaman told her no, because Lucent will begin layoffs soon.

176.     In the middle of April, shortly after the announcement, she attended a

meeting in Lucent's auditorium at which Lucent officials and Union President Joseph

Kanan spoke about the LCTOP package and answered employees' questions.  At this

meeting, neither Lucent nor the Union told Ms. McCarthy or the others that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.  Instead, they said that this was the final offer and if people didn't accept the LCTOP they could lose their jobs with no package.

177.     Before Ms. McCarthy signed her retirement paperwork she met with the person the letter told her to speak to if she had questions, her supervisor, Tim Perkins.  In his office, Ms. McCarthy told him that she did not want to sign the paperwork and retire if there was even a possibility another package was coming in the next year and that she wanted to stick around because she, "loved her job." Mr. Perkins told her there was no possibility of another package, either "use it or lose it." He also told her Lucent would start downgrading service workers, that if she did not accept this package she would likely lose her salary grade, be forced to take a night shift, and likely be given less hours.  This was confirmed by Joe Toto, another Lucent supervisor whom she asked the same questions to.

178.     Supervisors Toto and Perkins made Ms. McCarthy feel like she had to accept the package and when she didn't immediately indicate she would accept the package Ms. McCarthy claims that the harassment started.  It started by the supervisors and others saying things like "why don't you just leave" and "you've got enough service, take the package," but it progressed into more serious callings like

"your shift will become the night shift and that's not good for you because you can't drive—take the package, its what's best for you."

179.    Shortly before accepting the package, she went yet again to her Supervisor Tim Perkins, and again Mr. Perkins reiterated what he had said before.

180.    Ms. McCarthy retired on June 2, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package. Ms. McCarthy never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

181.    Ms. McCarthy would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.   But she was afraid to be laid off without any benefit package after serving Lucent for 30 years. She could have used the extra benefits because her husband was on social security and had no pension or health insurance.  In fact a week after Ms. McCarthy signed the paperwork she asked Mr. Perkins if she could change her mind and stay.  Mr. Perkins told her it was final.  Ms. McCarthy retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. McCarthy got a lump sum of $40,000 after deductions she says it was about $28,000.

182.    The first time Ms. McCarthy heard about the better Paragraph 5 benefits coming out was from former coworkers Shirley and Cathy in about August of

2001from who were bragging about the better offer they got with more money for less years of service. But Ms. McCarthy didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting in 2005 held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members. After the meeting with Gesmer & Updegrove, she and others like her waited for the outcome on class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. McCarthy retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Maria Murphy

183.     Maria  Murphy worked for Lucent Technologies and its predecessors for 21 years beginning March 31, 1980.  She currently lives at 20 Mill Road, North Andover, MA 01845.  When she retired on July 5, 2001 at age 65, her job title was Inspector, Level I, Inversion and she was a member of the Local 1365 Union.

184.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Murphy that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Murphy received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Murphy to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Murphy.  It also told her that Lucent will conduct meetings to further answer employees' questions.

185.     In April, following the letters' instructions, she spoke with her supervisor Evelyn Covet.  She asked Ms. Covet what was going on with this package, what does she need to know about it and was there going to be any better packages in the future.  Ms. Covet said all she needs to know is that if she doesn't take the package she will lose it and Lucent isn't offering anything else.  This was confirmed by Lucent Supervisors, Mark Apolo, Nancy Difio.

186.     Later, Ms. Murphy and others in her department attended a meeting for second-shift employees in Lucent's auditorium with speakers, Sheila Landers and Natasha Glendon-Crossley from Human Resources.  They explained the LCTOP benefits and answered questions. They never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, they told everyone this was the only package, there would be no others.

187.     Shortly before the deadline to accept, Ms. Murphy was called to meet with a Human Resources Representative she believes was either Sheila Landers or Natasha Glendon-Crossley to sign the enhanced LCTOP acceptance paperwork.  The representative didn't tell Ms. Murphy that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

188.     Ms. Murphy retired on July 5, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced

LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Murphy never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

189.    Ms. Murphy would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.   But she was afraid to be laid off without any benefit package after serving Lucent for 21 years. So Ms. Murphy retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Murphy got a lump sum of approximately $30,000, she believes after taxes was about $23,000.

190.    The first time Ms. Murphy heard about the better Paragraph 5 benefits and learned about all the details of the Paragraph 5 benefits offered in the MOA was at 2005 meeting held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in January 2007, Ms. Murphy retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Manual A. Neves

191.    Manuel A. Neves worked for Lucent Technologies and its predecessors for 25 years beginning October 1, 1976.  He currently lives at 379 Concord Road, Northfield, NH 03276.  When he retired on August 1, 2001 at age 54, his job title was Machine Operator and he was a member of the Local 1365 Union.

192.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Neves that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Neves received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Mr. Neves to ask benefits-related questions to his  supervisor because Lucent had given the supervisors the information to assist employees like Mr. Neves. It also told him that Lucent will conduct meetings to further answer employees' questions.

193.     In the middle of April,  Mr. Neves attended a meeting for second-shift employees in Lucent's auditorium with company speakers whose names he doesn't recall.  They explained the LCTOP benefits and tried to answer questions. They never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, they said there would be no other package.

194.     Later, Mr. Neves spoke with Human Resources official, Sheila Landers, and Plant Manager Dave Dunn regarding the LCTOP and asked them if any other packages were going to be coming out in the future.  They confirmed for Mr. Neves this was the only package, no other packages were going to be available and told him he should accept it because this is a limited time thing, it will be gone after the deadline.

195.     Shortly before the May 2 deadline to accept, Mr. Neves met again with Sheila Landers.  He met her to sign the enhanced LCTOP acceptance paperwork. When he asked her if she was positive no other packages were possible she again said this was the only package.  She again failed to tell Mr. Neves that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept LCTOP offer and were later laid off or outsourced.

196.     Mr. Neves retired on July 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Neves says he never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

197.     Mr. Neves would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. But he was afraid to be laid off without any benefit package after serving Lucent for 25 years. So Mr. Neves retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Neves got a lump sum of approximately $35,000 before taxes.

198.     The first time Mr. Neves heard about the better Paragraph 5 benefits coming out was in 2001 from fellow employees.  But Mr. Neves didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until he attended a 2005

## Lewis G. Parham

199.    Lewis  G.  Parham  worked  for  Lucent  Technologies  and  its predecessors for 40 years beginning August 1, 1960.  He currently lives at 75 Hadley Road, Merrimac, MA 01860-1308.  When he retired on June 1, 2001 at age 59, his job title was Tier 5 Quality Control Auditor and he was a member of the Local 1366 Union.

200.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Parham that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Parham received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Mr. Parham to ask benefits-related questions to his supervisor because Lucent had given the supervisors the information to assist employees like Mr. Parham. It also told him that Lucent will conduct meetings to further answer employees' questions.

201.    After getting the letters, Mr. Parham followed the instructions and asked his Supervisor Mr. Becken, if there was the possibility of a better package

coming out in the near future.  Mr. Becken told him no, to take this offer before the deadline or lose it and assured him this was the best offer he could get.

202.     Shortly before the deadline, Mr. Parham also attended the meeting mentioned in the letter, but he doesn't recall who spoke at the meeting.  The package was explained and questions were answered.  Mr. Parham doesn't recall the specifics names of the individuals that conducted the meeting, but knows they were upper management.  The same things Mr. Parham was told by his Supervisor Mr. Becken, assuring him this was the best package, that he should take it or he would lose the package and later possibly be out of the job, was echoed at the meeting.  None of the officials even hinted that if Mr. Parham or the other attendees stayed longer it was possible a better package would be available to those laid off or outsourced.  Instead he says his supervisor and the upper management conveyed a use it or lose it scare campaign to trick him and his colleagues to take the lesser package.

203.     Mr. Parham retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did because he could have been laid off without any benefit package.  Mr. Parham doesn't recall getting a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

204.     Mr. Parham would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.  But he was afraid to lose out on the only

benefit package after serving Lucent for 40 years. So Mr. Parham retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Parham got to continue working receiving what would have been a lump sum of about $40,000 monthly but because the taxes would have substantially eroded the lump sum he worked on call and collected monthly payments for 9 months, and in return for this work he was taxed at a lower rate.

205.    The first time Mr. Parham heard about the possibility of a better benefits package was from another former employee. He didn't know about the MOA or the details about the Paragraph 5 benefits offered in the MOA until 2005 when he spoke with a potential class member in the *Fici v. Lucent* lawsuit. Then after class certification was denied in that case, Mr. Parham retained Moukawsher & Walsh, LLC in December 2006 to represent him in this lawsuit.

## Joanne R. Payson

206.    Joanne R. Payson worked for Lucent Technologies and its predecessors for 34 years beginning April 10, 1967. She currently lives at 8 Murray Drive, Atkinson, NH 03811. When she retired on July 2, 2001 at age 55, her job title was Teir 5 Senior Material Management Analyst and she was a member of the Local 1366 Union.

207.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Payson that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept. Later,

Ms. Payson received another letter dated April 26 regarding a new enhanced LCTOP

benefit with a May 2  deadline to accept. The letters instructed Ms. Payson to ask

benefits-related questions to her supervisor because Lucent had given the supervisors

the information to assist employees like Ms. Payson. It also told her that Lucent will

conduct meetings to further answer employees' questions.

208.    Shortly after getting the announcement, Ms. Payson followed the

instructions and asked her Supervisor Sandy Nickerson is this the best deal, or is there

going to be a better package later.  Ms. Nickerson assured Ms. Payson this was the

best package she could get, there would be no other packages and further said she

should take it because if she doesn't she will likely lose a step in salary grade and the

offer will certainly be gone.

209.    Ms. Payson and others in her department attended a meeting for

employees in Lucent's auditorium with speakers, Sheila Landers from Human

Resources and Dave Dunn a Lucent Plant Manager.  Ms. Landers and Mr. Dunn

explained the LCTOP benefits and tried to answer questions. They never mentioned

that the MOA offered much more generous benefits under Paragraph 5 if employees

did not accept this voluntary LCTOP offer and were later laid off or outsourced.

Instead, they told everyone this was the only package, there would be no others, and

this is as good as it gets.

210.    In May and June, Ms. Payson also spoke with 1366 Union Steward

Marcy Vincent on multiple occasions.  Ms. Payson repeatedly asked Ms. Vincent if

there was the possibility of a better package.  Ms. Vincent echoed what Ms. Landers and Mr. Dunn told the group at the meeting, that this was the best offer.

211.     Shortly before the May 2 deadline to accept, Ms. Payson met privately with Sheila Landers to sign the enhanced LCTOP acceptance paperwork.  Despite asking again if this was the only and best offer she could get Ms. Landers told Ms. Payson this was it, and never told Ms. Payson that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

212.     Right before she decided to sign the paperwork Ms. Payson talked to Lucent Supervisors' Steve Sickle and Sandy Nickerson, and yet again they reiterated the same, this was it for packages and to take it because they would lose not only the package but perhaps her salary grade or job.  Ms. Payson felt like the company wanted her out.

213.     Ms. Payson retired on July 2, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Payson never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

214.     Ms. Payson would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact, she would have continued working

for as long as possible because she could have used the additional years of service to her pension and pay.  But she was afraid to be laid off without any benefit package after serving Lucent for over 34 years. So Ms. Payson retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Payson got to keep working on call until she had a different pension status and received monthly checks deduced from her lump sum amount of approximately $40,000, after taxes it was approximately $23,000.

215.    The first time Ms. Payson heard about the better Paragraph 5 benefits coming out was in 2001 from people still working at Lucent.  But Ms. Payson didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. Payson retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Patricia A. Picard

216.    Patricia A. Picard worked for Lucent Technologies and its predecessors for 25 years beginning June 24, 1976.  She currently lives at 440 North Avenue, Haverhill, MA 01830.  When she retired on June 1, 2001 at age 56, her job title was Production Associate Level 2 P2E and she was a member of the Local 1365 Union.

217.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Picard that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  The letter instructed Ms. Picard to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Picard. It also told her that Lucent will conduct meetings to further answer employees' questions.

218.    Because she only had two weeks to decide to accept the LCTOP offer, Ms. Picard immediately followed the letter's instructions, and spoke several times with her supervisor Cheryl Kyricopoulos in Vision, Building 1, 1600 Osgood Street, North Andover Massachusetts.  Ms. Picard was hearing rumors about better benefits so she asked Ms. Kyricopoulos several times if this was the right time to retire and if there was the possibility of a better package coming out in the near future.  Every time Ms. Picard asked Ms. Kyricopoulos, she would answer that there would be no better package in the future, this was the only package, and she better take it because the company was downsizing.

219.    At the same time Ms. Picard was speaking with her supervisor, she also asked coworkers if they had heard anything about the possibility of a better package than the LCTOP coming out in the near future.  Ms. Picard spoke with Mattie Carrier and Marie Gagnon numerous times at work.  They both told her that they were told the same thing, the LCTOP was the only package, there would be no others, and to

take it or else.  Ms. Picard and others like her were told almost daily in one way or another that this was the best offer and if we didn't take it they could lose their pay grades or even their jobs.

220.     In mid-April,  Ms. Picard attended a 7:30pm meeting for second-shift employees in Lucent's auditorium with speaker, Sheila Landers from Human Resources.  Ms. Landers explained the LCTOP benefits and tried to answer questions. Ms. Picard remembers there were so many questions and the answers to them were unclear.  Ms. Landers never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, Ms. Picard remembers Ms. Landers told everyone this was the only package, there would be no others.  She then directed them to contact a benefits number on the handout given to employees if they had questions.  The number didn't work.

221.     After the meeting, Ms. Picard tried to ask her supervisor Ms. Kyricopoulos questions and she directed Ms. Picard to the out-of-service phone number.  Finally, Ms. Picard got the correct number and was told the same thing – this is the only package, there will be no others.

222.     Ms. Picard signed and turned in the acceptance paperwork by the April 17 deadline.  Then, contrary to what she had been told all along, Ms. Picard received an April 26, 2001 letter increasing the LCTOP cap from $30,500.00 to $40,000.00 with a deadline of May 2, 2001 to decide.  Lucent allowed Ms. Picard to rescind her

Case 1:08-cv-10398-PBS   Document 1   Filed 03/11/08   Page 75 of 94


acceptance of the lesser cap for this enhanced LCTOP by May 2 so she could take advantage of the cap increase.

223.     Ms. Picard retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Picard never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

224.     Ms. Picard would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible. Ms. Picard felt rushed and confused with only a few weeks to make a life changing decision.  But she was afraid to be laid off without any benefit package after serving Lucent for 25 years. So Ms. Picard retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Picard got a lump sum of $40,000 before taxes.

225.     The first time Ms. Picard heard about the possibility of a better benefits package was rumors in 2001 circulating amongst former coworkers.  She didn't know about the MOA or the details about the Paragraph 5 benefits offered in the MOA until she attended a meeting in 2005 at Northern Essex Community College held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members. After the meeting with Gesmer & Updegrove Ms. Picard waited for the

outcome on class certification.  In 2006 she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. Picard retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Dorothy Porter

226.    Dorothy Porter worked for Lucent Technologies and its predecessors for 27 years beginning October 8, 1975.  She currently lives at 6 Flintlock Road, Salem, NH 03079.  When she retired on June 1, 2001 at age 60, her job title was P2E Final Inspection and she was a member of the Local 1365 Union.

227.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Porter that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Porter received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Porter to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Porter. It also told her that Lucent will conduct meetings to further answer employees' questions.

228.    After receiving the letters, Ms. Porter followed the instruction and spoke with her Supervisor Cheryl Kyricopoulos.  She asked Ms. Kyricopoulos if there was the possibility of another package.  Ms. Kyricopoulos responded that this was the one and only offer take it because this place is going to close.

229.     In the middle of April,  Ms. Porter attended a meeting for second-shift employees in Lucent's auditorium with speaker, Sheila Landers from Human Resources.  Ms. Landers explained the LCTOP benefits and tried to answer questions. She never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, she said this was it, this was the only package.

230.     Ms. Porter retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Porter never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

231.     Ms. Porter would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact she would have continued working until she was 62.  But she was afraid to be laid off without any benefit package after serving Lucent for over 25 years. So Ms. Porter retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Porter got a lump sum of approximately $20,000 after taxes.

232.     The first time Ms. Porter heard about the better Paragraph 5 benefits coming out was in 2001 from people still working at Lucent.  Ms. Porter didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended

a 2005 meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its

pending class certification.  In 2006, she was told by Gesmer & Updegrove that class

certification was denied. So in January 2007, Ms. Porter retained Moukawsher &

Walsh, LLC to represent her in this lawsuit.

### Carol A. Ross

233.    Carol A. Ross worked for Lucent Technologies and its predecessors

for 39 years beginning September 13, 1962.  She currently lives at 269 Salem Street,

Bradford, MA 01835.  When she retired on September 15, 2001 at age 59, her job title

was Senior Materials Management Analyst  Tier 5 Master Scheduler and she was a

member of the Local 1366 Union.

234.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees

like Ms. Ross that the workforce at the facility would be reduced, and announced the

LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms.

Ross received another letter dated April 26 regarding a new enhanced LCTOP benefit

with a May 2  deadline to accept. The letters instructed Ms. Ross to ask benefits-

related questions to her supervisor because Lucent had given the supervisors the

information to assist employees like Ms. Ross. It also told her that Lucent will

conduct meetings to further answer employees' questions.

235.    Ms. Ross was not at work the day her department attended a meeting

for office employees in Lucent's auditorium with speakers, Sheila Landers from

Human Resources and Plant Manager David Dunn.  But she was later told by

coworkers Carol Smith, Joanne Payson, Della Marrone and Sharon Donovan that, they explained the LCTOP benefits and answered questions. And that they told everyone this was the only package, there would be no others because production was slow, sales were down and they were downsizing.

236.    After she heard about what was said at the meeting with Ms. Landers and Mr. Dunn, Ms. Ross attended a department meeting with Supervisors Butch Bouchard and Joe Longey.  Mr. Longey echoed what Ms. Ross heard was said at the meeting, that this package was it.

237.    Shortly before the May 2 deadline to accept, Ms. Ross met with a Human Resource Representative, she recalls was either Betty Comeau or Carolyn Champy to sign the enhanced LCTOP acceptance paperwork.  The representative didn't tell Ms. Ross that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

238.    Ms. Ross agreed to retire on September 15, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Ross never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

239.    Ms. Ross would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a

voluntary Paragraph 5 offer was possible.  In fact she would have continued working because she was a widow and could have used the additional income.  But she was afraid to be laid off without any benefit package after serving Lucent for 39 years. So Ms. Ross retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits.  Instead under the enhanced LCTOP, Ms. Ross worked on call for about 5 more months to meet certain pension requirements and received monthly checks deducted from the lump sum of $40,000 she would have received.

240.    The first time Ms. Ross heard about the better Paragraph 5 benefits coming out was in November 2001 at a retiree meeting at the Knights of Columbus in North Andover.  But Ms. Ross didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied. So in December 2006, Ms. Ross retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Michael D. Santo

241.    Michael D. Santo worked for Lucent Technologies and its predecessors for 36 years beginning September 1, 1965.  During that time, he resided at 20 Harrington Avenue, Revere, MA 02151.  He was member of the Local 1365 union.  When he retired on June 1, 2001 at age 55, his job title was Shipping &

Receiving Associate.  Mr. Santo passed away on May 12, 2007 and is represented by his widow Marguerite Santo, the Administratrix of his Estate.

242.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Santo that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Santo received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Mr. Santo to ask benefits-related questions to his  supervisor because Lucent had given the supervisors the information to assist employees like Mr. Santo. It also told him that Lucent will conduct meetings to further answer employees' questions.

243.    Immediately after receiving the letters, Mr. Santo followed the letters' instruction and spoke separately with his Supervisor John Rose and a Human Resources representative, whose name he did not recall.  He asked Mr. Rose and the representative is there was the possibility of a better package offered, should he wait to maximize his benefit; are there other benefits beside health insurance.  Mr. Rose and the representative responded similarly, that this was the only offer.  They also told him that if he did not take the offer and stayed, he could be down graded in pay, transferred or worse laid off with no benefit package.

244.    In the middle of April,  Mr. Santo attended a meeting for second-shift employees in Lucent's auditorium with a speaker from Human Resources.  The speaker explained the LCTOP benefits and tried to answer questions. The speaker

never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, the speaker said there will be no other package than the one in front of them.

245.     Mr. Santo retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did or he could have been laid off without any benefit package. Mr. Santo never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

246.     Mr. Santo would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible. In fact, he would have continued working because he was only 55 years old and wasn't ready to retire. But he was afraid to be laid off without any benefit package after serving Lucent for 36 years. So Mr. Santo retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Santo got a lump sum of approximately $40,000 before taxes.

247.     The first time Mr. Santo heard about the better Paragraph 5 benefits coming out was in 2001 from fellow employees. But Mr. Santo didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until he attended a 2005 meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending

class certification.  In 2006, he was told by Gesmer & Updegrove that class certification was denied. So in December 2006, Mr. Santo retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

## Roberta A. Simmons

248.     Roberta A. Simmons worked for Lucent Technologies and its predecessors for 32 years beginning February 9, 1969.  She currently lives at 6 Sussex Court, Bradford, MA 01835.  When she retired on June 1, 2001 at age 61, her job title was Layout Operator at Level 3 and she was a member of the Local 1365 Union.

249.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Simmons that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Simmons received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2  deadline to accept. The letters instructed Ms. Simmons to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Simmons. It also told her that Lucent will conduct meetings to further answer employees' questions.

250.     Ms. Simmons attended the Lucent meeting mentioned in the letter with the rest of her department in Lucent's auditorium.  At this meeting, Sheila Landers from Human Resources and Natasha Glendon-Crossley a Personnel Supervisor, told Ms. Simmons and others attending that this was the best offer they could expect, there were no other packages coming out in the near future, and if they

did not take it they could lose their pay grade, shift preference or worse, their jobs if the plant closed.

251.     During this time, Ms. Simmons also spoke with her Supervisor Evelyn W. Kovach.  She asked about the possibility of a better package coming out in the near future and Ms. Kovach told her the same thing she had heard at the meeting, that this was the best offer they could expect and there were no other packages coming out in the near future; take it or else.

252.     Ms. Simmons retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did or she could have been laid off without any benefit package.  Ms. Simmons never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

253.     Ms. Simmons would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.  Ms. Simmons felt rushed and confused with only a few weeks to make a life changing decision. But she was afraid to be laid off without any benefit package after serving Lucent for 32 years. So Ms. Simmons retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Simmons worked on call for about 3 months, during which she received her monthly pay which was deducted from the lump sum of $40,000, the balance (about $21,000) was then paid out in July of 2001.

254.    The first time Ms. Simmons heard about the possibility of a better benefits package was rumors in 2001 circulating amongst her coworkers.  She didn't know about the MOA or the details about the Paragraph 5 benefits offered in the MOA until she attended a meeting in 2005 held by Gesmer & Updegrove to explain the *Fici v. Lucent* lawsuit to potential class members. After the meeting with Gesmer & Updegrove, Ms. Simmons waited for the outcome on class certification.  In 2006 she was told by Gesmer & Updegrove that class certification was denied.  So in December 2006, Ms. Simmons retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Leonard Spiegel

255.    Leonard  Spiegelworked for Lucent Technologies and its predecessors for 32 years beginning September 3, 1969.   He currently lives at 59 Ford Street, Methuen, MA 01844. When he retired on June 1, 2001 at age 53, his job title was Assembler and he was a member of the Local 1365 Union.

256.    By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Mr. Spiegel that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Mr. Spiegel received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Mr. Spiegel to ask benefits-related questions to his supervisor because Lucent had given the supervisors

the information to assist employees like Mr. Spiegel. It also told him that Lucent will conduct meetings to further answer employees' questions.

257.     After receiving the letters, Mr. Spiegel followed the instruction and spoke with his Supervisor Mark Coppla.  Mr. Coppla was handing out information about LCTOP and Mr. Spiegel asked him if this was the only package being offered or was there more to come.  Mr. Coppla told him no other packages would be offered. Mr. Coppla further stressed the importance of filling out the necessary information to accept the package and submitting it timely.

258.     Mr. Spiegel felt Lucent was pressuring him to accept the enhanced LCTOP.  While he believes now it was likely because the company did not want to provide him with a better package, at the time he thought it was because he used a scooter to get around due to a disability and because company officials we always impatient with him because of his disability.  For example, after the scooter broke for the second time, Lucent refused to fix it and threatened to reduce his pay because he was not able to be as productive.

259.     Mr. Spiegel retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a better package than the enhanced LCTOP and that he made the right decision retiring when he did.  Mr. Spiegel never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or his union.

260.     Mr. Spiegel would have stayed on working at Lucent if he had been told that if he was laid off or outsourced he would get a far better package or that a voluntary Paragraph 5 offer was possible.  In fact, he would have continued working because he was only 53 years old and wasn't ready to retire.  But because he was being pressured to leave by officials because of his disability he was afraid to have his pay reduced or worse be let go with nothing after serving Lucent for over 31 years. So Mr. Spiegel retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Mr. Spiegel got a lump sum of approximately $40,000 before taxes.

261.     The first time Mr. Spiegel heard about the better Paragraph 5 benefits coming out was in 2001 from former coworkers.  But Mr. Spiegel didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until he read an article about Gesmer & Updegrove handling the *Fici v. Lucent* lawsuit and its pending class certification.  He immediately contacted Gesmer & Updegrove.  In 2006, he was told by Gesmer & Updegrove that class certification was denied. So in December 2006, Mr. Spiegel retained Moukawsher & Walsh, LLC to represent him in this lawsuit.

## Theresa Staples

262.     Theresa  Staples worked for Lucent Technologies and its predecessors for 39 years beginning July 11, 1961.  She currently lives at 5 Salem Street, Salem, NH 03079.  When she retired on June 1, 2001 at age 63, her job title Senior Operator Level 2 and she was a member of the Local 1365 Union.

263.     By letter dated April 2, 2001, Lucent told Merrimack Valley employees like Ms. Staples that the workforce at the facility would be reduced, and announced the LCTOP voluntary separation package with an April 17 deadline to accept.  Later, Ms. Staples received another letter dated April 26 regarding a new enhanced LCTOP benefit with a May 2 deadline to accept. The letters instructed Ms. Staples to ask benefits-related questions to her supervisor because Lucent had given the supervisors the information to assist employees like Ms. Staples. It also told her that Lucent will conduct meetings to further answer employees' questions.

264.     On April 11, 2001, after receiving the letters, Ms. Staples followed the letters' instruction and met with her Supervisor Colleen Sheehan.  Ms. Staples asked Ms. Sheehan if this was the best package she could possibly get, and is this the only package that is going to coming out.  Ms. Sheehan told her this is the only package coming and the best package.   When  Ms. Staples told Ms. Sheehan that she was not going to retire and wanted to work further, Ms. Sheehan told her "no, you are going to retire on May 31, 2001."  Ms. Sheehan also told Ms, Staples that she must accept the package and that she has no choice but to accept the package.

265.     The same day that Ms. Staples was told by her Supervisor she could not continue working and had to retire on May 31, 2001 and had to accept the package, she was called to the Human Resources office, in the company's North Andover office, where she spoke with a senior HR official.  The official told Ms. Staples her pension was wrong, she is going to receive less money.   Ms. Staples was

confused by this statement and called Lucent's Benefits Hotline to inquire further. During these conversations, neither the Human Resources official nor the Hotline representative told Ms. Staples that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced.

266.     In the middle of April,  Ms. Staples attended a meeting for employees in Lucent's auditorium with speakers Sheila Landers of Human Resources and Plant Manager Dave Dunn.  The speakers explained the LCTOP benefits and tried to answer questions. The speakers never mentioned that the MOA offered much more generous benefits under Paragraph 5 if employees did not accept this voluntary LCTOP offer and were later laid off or outsourced. Instead, they said there will be no other package

267.     Ms. Staples retired on June 1, 2001, feeling confident in light of the official assurances that there was no possibility of a  better package than the enhanced LCTOP and that she made the right decision retiring when she did.  Ms. Staples never received a copy of the MOA containing the Paragraph 5 benefits from Lucent or her union.

268.     Ms. Staples would have stayed on working at Lucent if she had been told that if she was laid off or outsourced she would get a far better package or that a voluntary Paragraph 5 offer was possible.   In fact she would have continued working because she wanted to complete her 40 years of service and didn't want to start her

social security benefits early.  But she was told by her supervisor that she had to retire with this package, that she had no choice. So Ms. Staples retired based on Lucent's assurances and lost out on the more lucrative Paragraph 5 benefits. Instead under the enhanced LCTOP, Ms. Staples got a lump sum of approximately $23,000 after taxes.

269.    The first time Ms. Staples heard about the better Paragraph 5 benefits coming out was in September 2001 from former coworkers.  But Ms. Staples didn't learn about all the details of the Paragraph 5 benefits offered in the MOA until she attended a 2005 meeting held by Gesmer & Updegrove about the *Fici v. Lucent* lawsuit and its pending class certification.  In 2006, she was told by Gesmer & Updegrove that class certification was denied.  So in January 2007, Ms. Staples retained Moukawsher & Walsh, LLC to represent her in this lawsuit.

## Count I
## Breach of Fiduciary Duty under ERISA §502(a)(3)

270.    Plaintiffs reassert the allegations in Paragraphs 1 through 269 above.

271.    The Plans (Lucent Technologies Pension Plan, Lucent Technologies Inc. Life Insurance Plans, Lucent Technologies, Inc. Long Term Care Insurance Plan, Lucent Technologies Inc. Medical Expense Plan, Lucent Technologies, Inc. Dental Expense Plan and Lucent Technologies Long Term Savings and Security Plan) are "employee benefit plans" as that term is defined by ERISA §§ 3(1), (2) and (3). LCTOP is also an "employee benefit plan."

272.    At all relevant times, Lucent was (a) the "sponsor" of the Plans and LCTOP as that term is defined under ERISA § 3(16)(B); (b) the "administrator" of the Plans and LCTOP as that term is defined under ERISA § 3(16)(A); (c) and a "fiduciary" of the Plans and LCTOP as that term is defined under ERISA § 3(21).

273.    ERISA § 404(a)(l)(A) imposes on a plan fiduciary a duty of loyalty, which obligates it to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."   In addition, ERISA §404(a)(l)(B) imposes on a plan fiduciary a duty of prudence, which obligates it to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

274.    A plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform. This duty entails: (1) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (2) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

275.    At all relevant times the Plaintiffs were "participants" in the Plans and LCTOP, as that term is defined by ERISA § 3(7).   Accordingly, Lucent owed the

fiduciary duties of loyalty and prudence to the Plaintiffs.  Lucent breached those duties by, *inter alia*:

a.   Failing to timely disclose to the Plaintiffs the existence and terms of Paragraph 5 of the MOA, and the fact that each Plaintiff would be entitled to substantial benefits if he or she remained with the Company and was involuntarily terminated for any reason other than for disciplinary reasons—including outsourcing;

b.   Failing to timely disclose to the Plaintiffs that the voluntary offer of Paragraph 5 Benefits had been adopted or was being seriously considered by the Company;

c.   Failing to disclose to the Plaintiffs that the Company had a financial incentive for employees to elect the LCTOP package; and

d.   Failing to timely disclose the Memorandum of Agreement's terms.

The Plaintiffs reasonably relied on the information given to them by Lucent in making their decision to accept LCTOP and leave the Company.  That information contained material omissions, such that the Plaintiffs were deprived of the opportunity to make an adequately told decision in that regard.

276.   Lucent's breaches have harmed the Plaintiffs.  *Inter alia*, they have been effectively deprived of benefits under the Plans which in good conscience should belong to them, and Lucent and the Plans have been unjustly enriched by being able to retain such benefits.

## Count II
## Breach of ERISA §502(a)(1)(B)

277.   Plaintiffs reassert the allegations in Paragraphs 1 through 276 above.

278.    Lucent breached its duties under the terms of the Plans, including without limitation its duty to administer the Plans fairly and in good faith and in compliance with ERISA, by failing to disclose to participants (including Plaintiffs) changes in Plan benefits at a time when those participants were deciding whether to remain with the Company.

279.    Lucent's breaches have harmed the Plaintiffs.  *Inter alia*, they have been effectively deprived of benefits under the Plans which in good conscience should belong to them and have otherwise been harmed, while Lucent and the Plans have been unjustly enriched by being able to retain such benefits.

## Prayer For Relief

WHEREFORE, Plaintiffs pray for the following relief:

A. With respect to ERISA §502(a)(3):

1. For reinstatement in the Plans for the purpose of each Plaintiff receiving Paragraph 5 Benefits; and

2. For an order and/or permanent injunction directing Lucent to amend the provisions of the Plans to permit each Plaintiff to accept the September 2001 offer of the Paragraph 5 Benefits, and directing Lucent and the Plans to grant each Plaintiff the Paragraph 5 Benefits in the same manner and to the same extent as it granted them to all other persons who accepted such offer; and

    3.  For restitution from the Plans, of the Paragraph 5 Benefits.

B.  With respect to ERISA §502(a)(1)(B):

    1.  For all benefits Plaintiffs would have received under the September 2001 offer, or equivalent relief.

C.  With respect to all claims:

    1.  For interest at the legal rate;

    2.  For costs;

    3.  For attorney's fees, including fees under ERISA §502(g);

    4.  For such other and further relief as the Court may deem just.


Dated March 7, 2008

THE PLAINTIFFS,

By their attorneys,


/s/ Mala M. Rafik
Mala M. Rafik
BBO No. 638075
ROSENFELD & RAFIK, P.C.
44 School Street
Suite 350
Boston, MA  02108
(617) 723-7470