UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
WILLIAM F. ARIVELLA, et al.,    )
                                )
              Plaintiffs,       )
                                )
         v.                     )   CIVIL ACTION NO.
                                )   08-CV-10398-PBS
ALCATEL-LUCENT, et al.,         )
                                )
              Defendants.       )
_____)
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

December 22, 2010

Saris, U.S.D.J.

This case involves the elimination of jobs at defendants Alcatel-Lucent USA, Inc.'s ("Lucent's") Merrimack Valley Works ("MVW") manufacturing facility in North Andover, Massachusetts. In the course of roughly one year, Lucent downsized its MVW workforce by approximately ninety percent, from approximately 3,400 to 340, through multiple rounds of layoffs and buyouts. Twenty-seven plaintiffs, who accepted voluntary retirement packages in April 2001, have sued Lucent, alleging that it made various misrepresentations and material omissions in violation of the Employee Retirement Income Security Act ("ERISA").

Plaintiffs brought this action after the Court (Lindsay, J.) declined to certify a class of former Lucent employees in a related case. See Fici v. Lucent Techs., Inc., No. 02-10536-RCL

(D. Mass. Sept. 29, 2005) (denying class certification).

Defendants moved for summary judgment on the grounds that (1) the buyout was not an ERISA plan; and (2) the action was barred by the statute of repose.  The Court (Young, J.) denied the motion and the case was reassigned.  To streamline the legal and factual issues for both parties, the Court elected to try only four plaintiffs, two chosen by each side, in a preliminary bench trial.  The trial ran from June 7, 2010, through June 10, 2010, after which the parties submitted post-trial memoranda.  The Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**A.    Bad Times**

MVW was one of several facilities operated by Lucent to manufacture telecommunications equipment.  Principally, the plant produced circuit packs and other items used in the assembly of conventional telephones.  At its peak in the 1960s and 70s, the MVW facility employed more than 10,000 people.  (Trial Tr. vol. 2, 64, June 8, 2010.)  By 2000, however, the company was outsourcing much of its work to China and elsewhere, and was looking to lay off and buy out many of its employees.  Between January 2000 and April 2001, Lucent's stock price declined steadily from approximately $75 per share to less than $10 per share.  (Ex. 58.)  Indeed, in April 2000, Lucent publicly

announced a major shift in manufacturing strategy, indicating
that it would "expand its relationship with contract
manufacturing partners" as it sold, spun off, and outsourced
substantial numbers of the more than 30,000 workers it employed
domestically.  (Ex. 3 at 1-2.)  "The company estimate[d] that
most of the transition w[ould] be completed in the next 18 to 24
months."  (Id. at 2.)

At MVW, employees were worried because there was not enough
work to do, reducing some workers to reading books, playing
cards, and doing puzzles during their shifts.  (Trial Tr. vol. 1,
106, June 7, 2010.)  Lights were out at night, though there used
to be three shifts.  (See id. at 156.)  Rumors of bankruptcy
floated, both workers and management expected layoffs, and the
future of the plant was uncertain.  (See, e.g., Trial Tr. vol. 4,
16, 49-50, 52-53, June 10, 2010.)

**B.    The April 2001 Layoffs**

All of the employees at Merrimack Valleys were members of
the Communications Workers of America ("CWA") Locals 1365 and
1366.  In rough terms, Local 1365 represented production workers
and Local 1366 represented administrative or office personnel.
Three of the plaintiffs at issue here were members of Local 1365
and one (Payson) was a member of Local 1366.  Lucent and CWA had
agreed to pay certain severance benefits to laid off workers
through a program in the Collective Bargaining Agreement known as

3

the Lucent Career Transition Option Program ("LCTOP"). (Ex. 1.)
Layoffs were conducted in inverse seniority order; low seniority
workers were let go first. Under certain circumstances, layoffs
triggered an obligation by the company to offer benefits to all
employees to induce voluntary departures and minimize the number
of involuntary layoffs.

On April 2, 2001, Lucent declared a "surplus" of 725 MVW
employees and designated an equal number of workers as "at risk"
of being laid off. (Ex. 86.) As required by the collective
bargaining agreement, management offered voluntary leave packages
through LCTOP to all remaining employees with more than two years
of service, including plaintiffs, providing a financial benefit
to any eligible employee who opted to retire or resign
voluntarily. The voluntary plan permitted employees to take
their payment as a lump sum (the optional term pay, or "OTP"), or
through several weeks of additional paychecks (the Extended
Compensation Option, or "ECO"), and permitted two additional
options for a leave of absence that would culminate in the
termination of employment. The incentive available differed
based on each employee's age and length of service with Lucent,
with a maximum lump sum payment of $30,500. (Exs. 121, 138, 157,
172.) All four of the plaintiffs were eligible to receive the
maximum OTP payment or varying durations of continuing paychecks
under the ECO program. (Id.)

Employees eligible for the voluntary LCTOP program received

4

a packet of paperwork describing the various options on April 2, 2001, including a personalized letter explaining their potential OTP and ECO benefits and an individual pension calculation. (See Ex. 181.) These letters also told employees:

> Your supervisor has been provided additional, more detailed, information on each option as well as individualized information to further assist you in making an informed decision. In addition, a series of informational sessions are being planned to help answer any questions you may have.

(Exs. 121, 138, 157, 172.) Each individualized letter also included an information packet, including election forms and explanation for each of the available options, including tax implications. (Ex. 181; Trial Tr. vol 2, 107, June 8, 2010.) The April 2 letters permitted employees to elect (or revoke) any decision to participate in the voluntary departure program prior to April 17, 2001.

Lucent conducted informational sessions throughout April. Sessions held on April 5, 6, 9, and 10, 2001, targeted employees considering the voluntary LCTOP option.[1] (Ex. 19.) David Dunn, the plant manager, and Sheila Landers, the head of Human Resources ("HR"), presented at these sessions. Landers used pages of the informational packet distributed in employees' individualized offer letters as slides to brief the employees on the LCTOP options. She also fielded questions, assisted by

---

[1] A separate set of meetings scheduled for April 24 and 27 and later rescheduled for April 30 addressed the concerns of "at-risk" employees. (Id.)

Natasha Glendon-Crossley, who also was from HR, and Leon (Lee) Pratt, the plant's head of Workforce Relations.  Employees asked repeatedly whether they could expect a better voluntary departure package in the future.  Landers and the other management staff in the informational meetings stated that they could not and would not speculate about future circumstances.  Some individual supervisors, however, told their employees to take the package because no better one would be forthcoming.

C.    **The Memorandum of Agreement**

The CWA Locals distributed leaflets to their members with information about the LCTOP options and posted additional data on their respective bulletin boards and websites.  An April 4, 2001, letter from Joseph Kanan, President of Local 1365, notified employees that the National CWA was negotiating an enhanced LCTOP with Lucent and advised employees interested in accepting the voluntary departure package to wait until the last possible day to accept the offer in order to avoid missing out on any expanded benefits.  (Ex. 18.)

On April 12, 2001, Lucent informed MVW employees that the deadline for accepting the LCTOP offer was being extended to May 2, 2001, to allow Lucent and the Union to complete negotiations on potential enhancements to LCTOP.  (See Ex. 184.)  The Union similarly advised its members that negotiations were ongoing, that it was likely the cap on lump sum payments would increase,

and that they should hold off accepting LCTOP until a deal with
done.  (Id.)

A week later, on April 19, 2001, Lucent and the Union
reached an agreement, memorialized in a memorandum of agreement
(the "MOA"), regarding benefits for MVW employees.  (See Ex. 26.)
These negotiations took place at a national level; that is, the
local union officers and local plant management were not
involved.

Paragraph 4 of the MOA modified LCTOP by increasing the
maximum payment available from $30,500 to $40,000.  (Id. at 2.)
All four plaintiffs benefited from this increase in the cap, and
it was applied automatically to the two plaintiffs (Simmons and
Lacroix) who enrolled before the MOA was signed.  (See Exs. 140,
174.)  The eligible employees, including plaintiffs, received
individualized letters dated April 26, 2001, informing them of
their available benefits under the enhanced LCTOP.  (See Exs.
122, 140, 159, 174.)  Three of the plaintiffs qualified for the
maximum $40,000 lump sum payment, and the fourth (Lacroix) was
eligible for $38,122. (Ex. 140.)

Paragraph 5 of the MOA added a new provision to provide
benefits for eligible employees who were underlinevoluntarily separated
due to outsourcing or subcontracting of work.  Those included (a)
a five year age and service credit for pension plan eligibility;
(b) a one-time Social Security reduction reimbursement related to
early retirement; (c) a one-time lump sum special pension benefit

equal to (depending on age and seniority) up to 234% of an employee's annual pay to be paid from the pension trust; (d) a one-time lump sum transition payment of $3,400, also to be paid from the pension trust; (e) continuation of health insurance for one year and certain life insurance and accidental death and dismemberment insurance benefits for six months; (f) an education/training/out-placement or relocation benefit, worth up to $5,000 to be paid out when voucher were submitted; (g) early vesting of an employee's long term savings and security plan benefits; and (h) the ability to roll over the payments into an IRA and thereby defer taxes. (Ex. 26 at 3-11, see also Ex. 183 (summarizing these benefits in a PowerPoint presentation for at-risk employees).)

Most of these benefits would not have applied to these plaintiffs in any case.[2] The only benefits that they claim are relevant are the lump-sum special pension benefit (which could be rolled over into an IRA) and the $3,400 transition payment. (See Pls.' Post-Trial Mem. at 5.) While the record does not contain evidence of plaintiffs' annual salaries, it is undisputed that, given their seniority, they would have received substantially more had they been laid off and received the Special Pension Benefit in accordance with Paragraph 5 of the MOA, likely in

---

[2] For example, the extended health and life insurance benefits would not have benefited them, as all four were already retirement eligible.

excess of $100,000.[3]  Lucent paid for paragraph 5 benefits out of surplus pension assets.

Lucent did not distribute the Memorandum of Agreement to the employees.  Rather, management informed the front-line supervisors about the MOA and distributed an explanatory memorandum to them.  The company also instructed them to provide answers to employees' questions or to refer them to other sources who were more knowledgeable, such as Workforce Relations. Management held a meeting on April 30, 2001, to explain the new benefits to the 725 employees who had been designated "at risk" in the impending layoffs.  (See Ex. 183.)

The company made no explanation of these benefits to other employees, including plaintiffs, who were not in imminent danger of being laid off.  Since the MOA only affected the cash value of the voluntary LCTOP plan, management did not conduct another information session for the voluntary population, but instead sent another set of individualized letters notifying them of the cash amount available to them under the enhanced LCTOP program. Lucent relied primarily on the Union to notify those employees who were not then at risk of being laid off about the other

_____

[3] The SPB's schedule of benefits provided differing percentages of an employee's annual pay based on years of service.  Under this schedule and given their seniorities in 2001, three of the plaintiffs would have received the maximum benefit, equal to 234% of their annual pay.  (See Ex. 26 at 7.) Lacroix, who had only twenty-six years of service, would have received 168.75% of her annual pay.  (See id.)

changes effected by the MOA.  (<u>See</u> Trial Tr. vol. 3, 114, June 9,

2010.)  The union Locals posted copies of the document on their

websites, and further information with regard to both the MOA and

the underlying collective bargaining agreement[4] through Workforce

Relations and the Employee Resource Center, an informational

resource staffed by local union representatives.

Ultimately, approximately 470 employees elected the

voluntary LCTOP (and VSOP) benefits in April 2001 and

approximately 265 employees with at least two years of service

were laid off and received the alternative severance benefits set

forth in Paragraph 5 of the MOA.

**D.   <u>Further Layoffs</u>**

As expected by most employees and management, Lucent made

new rounds of layoffs on or about July 12, 2001, and again

offered enhanced LCTOP payments in an attempt to alleviate the

surplus with voluntary layoffs.  Two months later, in September

2001, Lucent announced the elimination of 950 additional

positions.  Lucent and the Union negotiated and entered into a

special agreement on or about September 20, 2001, in which

Paragraph 5 benefits were extended to those who agreed to leave

<u>voluntarily</u>.  Approximately 1,211 employees responded favorably

to this offer and Lucent decided to take them all, with many

---

[4] The collective bargaining agreement provided other
benefits to employees whose employment was terminated as the
result of a plant closing.

leaving over a staggered schedule.

By the end of 2001, ninety percent of the Merrimack Valley workforce had been retired or been laid off and the work involving circuit boards and circuit packs had been outsourced in favor of more complex assembly work. The remaining few comprised a mix of those too senior to have been targeted in the previous rounds of layoffs and too junior to have found the voluntary retirement packages attractive. The MVW plant finally closed in 2008.

**E.    Plaintiffs' Individual Experiences**

> **1.    Joanne R. Payson**

Joanne Payson worked at Lucent from 1967 to 2001 as an office worker. In 2001, she was a Tier 5 Senior Material Management Analyst and a member of Local 1366. (Trial Tr. vol 1, 9, 25, June 7, 2010.) When she retired, Ms. Payson was fifty-five and had intended to work until she was sixty-two and eligible for Social Security. (<u>Id.</u> at 16, 32.) By that time, the paperwork she handled indicated decreasing production and she learned that the company was outsourcing work to China and elsewhere.

Payson was not designated an at-risk employee in April 2001, but she received the initial LCTOP voluntary offer in a letter dated April 2, 2001, which stated that she was eligible for the maximum $30,500 lump sum or 32.16 weeks of extended compensation.

(Ex. 157.)  The second, post-MOA letter on April 26, 2001,
increased the offer to $40,000 or 42.18 weeks of extended pay.
(Ex. 159.)  Payson initially consulted her supervisor, Sandra
Nickerson, and spoke later with both Nickerson and her department
head, Steve Sickle, to ask whether the enhanced LCTOP was the
best deal available or if there would be others.  Both told her
that there would not be another offer and indicated that she
risked being downgraded or laid off altogether if she remained.
(Trial Tr. vol. 1, 47-48, June 7, 2010.)  Payson felt that
management wanted her to leave.  (Id. at 51.)

Payson also attended one of HR's informational meeting with
hundreds of other employees to discuss the LCTOP offer.  On April
25, 2001, Payson accepted the $40,000 offer primarily as a lump
sum and left work in June 2001.[5]  She was not at risk of being
laid off in April 2001, and claims that she would not have
retired had she known she would be eligible for a better
severance package had she remained at Lucent and later been
outsourced and/or laid off.  (See Trial Tr. vol. 1, 59-60, June
7, 2010.)  She quickly learned of the September 2001 voluntary
retirement package, including Paragraph 5 benefits, from friends
who had remained at the company.  (Id. at 53-54.)

_____

[5] Payson opted for a brief period of extended compensation
in order to increase her term of service and improve her pension
benefits.  (See Ex. 158.)  Although she accepted the LCTOP offer
the day before receiving the second offer, Payson received the
enhanced $40,000 package.  (Compare id. with Ex. 159.)

## 2. **Roberta A. Simmons**

Roberta Simmons worked at Lucent and its predecessors from 1969 to 2001 as a shopworker and a member of Local 1365. In 2001, when she was sixty, she intended to work to the age of sixty-five. (Id. at 106.) By that time, Ms. Simmons had held two different manufacturing jobs relating to circuit board layout that had been outsourced already. Her present work involved testing and inspection of completed circuit boards, a downgrade from her previous work that had been grandfathered in so as to prevent future downgrades. (Id. at 139.) Nevertheless, in 2000 there was little work to be done in her department, and she and her fellow employees often read or did puzzles during their shifts. (Id. at 106.)

On April 2, 2001, she received the initial LCTOP offer of $30,500 or 37.43 weeks extended pay. (Ex. 172.) She later received the enhanced offer of $40,000 or 49.09 weeks pay on April 26. (Ex. 174.) On April 10, in the intervening period, Simmons signed an employee request form accepting the original LCTOP offer, which she eventually revoked in favor of the enhanced offer, which she took in the form of extended compensation. (Ex. 173.)

Simmons had asked Evelyn Kovach, her floor supervisor, if a better package would be available and was told no. (Trial Tr., vol. 1, 115, June 7, 2010.) She claims that the Union gave her

the same information.  Upon hearing about the enhanced, $40,000 offer, she attended a meeting hosted by HR at which employees asked about the program benefits and the possibility of rolling any payment over into an IRA.[6]  In response to questions about the possibility of future retirement packages, she remembers Ms. Landers saying that the current offer "was the best that would be available, and there wouldn't be any other offers."  (Id. at 119.)  Simmons claims that she would have stayed at the company if she had been told that she could have remained and received a more lucrative severance package if/when she was outsourced. (Id. at 124.)

Simmons' supervisor, Kovach, had a meeting with about fifty people in her department in the auditorium after Lucent announced the enhanced LCTOP offer.  She told her employees that the enhanced program was the best package available and that there would not be any better ones.  (Id. at 121.)  She added that there was a possibility of being downgraded or losing shift preferences for those that remained.  (Id.)

Simmons left Lucent at the end of May 2001 and later learned of the paragraph 5 benefits in September 2001, when her daughter,

_____

[6] Unlike the Special Pension Benefit payments under paragraph 5 of the MOA, which were paid out of the company pension fund, payments made under the voluntary LCTOP program were made from Lucent's operating fund and could not be rolled over into an IRA to avoid immediate taxation.  (Trial Tr. vol. 3, 92-94, June 9, 2010; see also Ex. 181 (noting in the information packet distributed to employees that federal and state income tax applies to the OTP option).)

also a Lucent employee, accepted those benefits and retired
voluntarily. (Id. at 122.)  Like Payson, Simmons had no
expectation of being laid off in April 2001 or the foreseeable
future due to her seniority.  (Id. at 142-43.)

### 3.  **Albert R. Gauvin**

Mr. Gauvin, who attended trade school in Haverhill,
Massachusetts, began working for Lucent in 1960 as a platemaker.
(See id. at 150.)  His job was outsourced to another (domestic)
company, and by 2000, he was a stock selector, retrieving
electrical components from the stockroom as needed by tradesmen.
He heard rumors that many jobs had been outsourced to Mexico and
China. (Id. at 151-53.)  The plant was increasingly dark at
night, and he did not know if it would be closed. (See id. at
156.)

On April 2, 2001, when Gauvin was sixty-one, he received the
initial LCTOP offer of $30,500 or 36.03 weeks of extended
compensation. (Ex. 121.)  He attended an HR informational meeting
and also discussed the offer with his supervisor, Jack Verrette,
who advised him to "'take this [package], or you might get laid
off and get nothing.'" (Trial Tr. vol. 1, 158, June 7, 2010.)
According to Gauvin, both management and the Union indicated
that, while the amount of the lump sum payment might increase,
there would be no change in the overall structure of the offer.
(Trial Tr. vol. 2, 7, June 8, 2010.)

When the enhanced LCTOP offer was announced, Gauvin received a second letter offering him $40,000 or 47.26 weeks extended compensation. (Ex. 122.) He discussed the offer again with his supervisor, who said that negotiations between Lucent and the CWA were over and that there would be no further improvements in the package. Gauvin also said that he attended a second meeting run by HR in the plant auditorium. If so, it appears that it was before the MOA was accepted, because the only meeting following the April 19 signing of the agreement was on April 30, three days after Gauvin accepted the enhanced LCTOP offer in the form of extended compensation. (See Ex. 123.) Gauvin indicated that, had he remained at Lucent and later been laid off, he would have received close to $120,000 under the Special Pension Benefits provision described in paragraph 5 of the MOA. (Trial Tr., vol. 2, 16-17, June 8, 2010.) He had no plans to retire at the time and intended to work for several years in 2001. (Id. at 18.) Because of his seniority, however, Gauvin himself admits that he was not at risk of being laid off in the future and "would have been one of the last." (See id. at 57.)

## 4. **Lucille Lacroix**

Plaintiff Lucille Lacroix, a high school graduate, worked in multiple jobs at Lucent beginning in 1967, but had only twenty-six years of credit service. (Id. at 63, 77-78.) She began her career at Lucent in assembly and soldering work and, by 2000, was

16

working as a P2E Storeroom employee and a member of Local 1365. (Id. at 63.)  During her tenure, she saw the plant dwindle from approximately 13,000 employees to fewer than 5,000.  It was common knowledge that Lucent was outsourcing, and Lacroix saw notices on a blackboard in a conference room that the manufacture of cables would be made by another company.  (Id. at 66-67.)  Her own previous job had been outsourced in 1999 prior to her transfer to the storeroom.  She had no retirement plans and loved her work.  (Id. at 72.)  She felt there was no chance that her present work in the storeroom would be outsourced, though she did believe that there was a chance the plant would close.

On April 2, 2001, her supervisor, Cheryl Kyricopoulos, handed her a letter with the initial LCTOP offer for $30,500 or 39.2 weeks extended pay.  (Ex. 138.)  When she asked, Kyricopoulos told her that there were no plans for another, better offer in the future.  (Trial Tr. vol. 2, 69, June 8, 2010.)  Lacroix thought the LCTOP package was a generous offer and accepted it on April 13, 2001.  (Ex. 140.)  She did not attend any of the initial meetings conducted by HR, but appears to have attended the meeting on April 30 after learning of the enhanced LCTOP offer.  She learned of that offer through another individualized letter distributed by her supervisor, who again indicated that there would be no better offer in the future.  (Trial Tr. vol. 2, 71, June 8, 2010.)  Under the enhanced LCTOP, Lacroix was eligible for $38,122 or 49 weeks pay, which she took

17

as a lump sum.  (Ex. 140.)  Although she was eligible for Social
Security and her pension benefits, Lacroix claims that she would
not have accepted the offer had she known about the availability
of paragraph 5 benefits for those later laid off.  (Trial Tr. vol
2, 77, 80, 85-86.)  She also claims that Maddie Carrier, a Union
steward and a friend of Lacroix's, did not tell her about these
benefits when asked, and that Carrier's own husband accepted the
$40,000 offer in April 2001.  (Id. at 90.)

D.    **Factual Conclusions**

1.    I find that Lucent did not make any intentional
misrepresentations or omissions about paragraph 5 benefits to the
plaintiffs.  These plaintiffs were not going to be laid off in
April 2001 and were so senior that they were not at risk of being
laid off in the foreseeable future.  As such, paragraph 5 did not
apply to them at that time.

2.    I do not find plaintiffs credible when they said that
they would not have retired if they had known about paragraph 5
benefits because they all had such high seniority that they did
not expect to be laid off.  In one employee's words, they
expected to be "one of the last [ones standing]."  (Trial Tr.
vol. 2, 57, June 8, 2010.)

3.    There is no evidence that Lucent's employees knew or
should have known in April 2001 that paragraph 5 benefits would
be extended in September 2001 to voluntary departures.  While I

18

find that some lower level supervisors did express the opinion that employees should take the LCTOP offer in April because there would be no better packages in the future, I do not find that this was an intentional misrepresentation. It may have been a negligent misrepresentation. A truer statement would have been that the supervisor did not know whether there would be a better package. Regardless, I find that plaintiffs would have accepted the April LCTOP package even if the supervisor had said he did not know whether a better package would be offered.

**E.   Legal Discussion**

Because this action involves twenty-three more plaintiffs, the Court addresses the cross-cutting legal issues in this case.

**1.   ERISA's Application**

Defendants argue that neither LCTOP nor paragraph 5 of the MOA, either separately or in conjunction, constitutes an ERISA plan. A "plan" falls within ERISA only if its "provision by nature requires an ongoing administrative program to meet the employer's obligation." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987). Thus, courts look to "the nature of and extent of an employer's benefit obligations." Rodowicz v. Mass. Mut. Life Ins. Co., 192 F.3d 162, 170, modified on other grounds, 195 F.3d 65 (1st Cir. 1999). "Where subjective judgments would call upon the integrity of an employer's administration, the fiduciary duty imposed by ERISA is vital. But where benefit

19

obligations are administered by a mechanical formula that
contemplates no exercise of discretion, the need for ERISA's
protections is diminished." O'Connor v. Commonwealth Gas Co.,
251 F.3d 262, 267 (1st Cir. 2001) (O'Connor II). "The
determination of what constitutes an ERISA plan thus turns most
often on the degree of an employer's discretion in administering
the plan." Id.

The First Circuit's holdings applying Fort Halifax indicate
that LCTOP and the MOA are not ERISA plans. Most apposite is
O'Connor II, where plaintiffs who retired under an early
retirement plan alleged a breach of ERISA fiduciary duties
against an employer who implemented a second, more generous
voluntary retirement package after they left. The court held
that this second package was not an ERISA plan, as it consisted
primarily of a "one-shot, take-it-or-leave-it incentive," the
administration and application of which was purely mechanical
once an employee opted in, making the risk of employer abuse or
mismanagement negligible. Id. at 266-67. The package also
included an educational benefit, pension credit, and COBRA
premiums, which the court deemed a minimal administrative burden
and peripheral enough not to transform the entire package into an
ERISA plan. Id. at 269-70.

The First Circuit's other holdings follow the same
reasoning, declining to find an ERISA plan where the package in
question consists primarily of a one-time lump sum benefit.

20

<u>Rodowicz</u>, 192 F.3d at 170-72 (holding that a voluntary
termination program offering a one-time severance benefit payable
as a lump sum or incremental payments was not an ERISA plan);
<u>Belanger v. Wyman-Gordon Co.</u>, 71 F.3d 451, 455-56 (1st Cir. 1995)
(holding that successive lump-sum offers to voluntary retirees
did not, singly or in aggregate, constitute an ERISA plan).
<u>Simas v. Quaker Fabric Corp. of Fall River</u>, 6 F.3d 849, 854 (1st
Cir. 1993), which did find an ERISA plan, based that conclusion
on the facts that "the time period [for acceptance] is prolonged,
individualized decisions are required, and at least one of the
criteria is far from mechanical."  The critical criterion there
was whether an employee was terminated for cause, a determination
made by the employer that the court held to require ongoing
administration and discretion as to eligibility.

Here, LCTOP falls plainly within the sweep of <u>Fort Halifax</u>,
<u>O'Connor II</u>, <u>Rodowicz</u>, and <u>Belanger</u>.  It consists wholly of a
one-time cash benefit, requiring a simple mechanical calculation
and disbursement when an employee accepts the offer, and no
further administration by Lucent.  The fact that Lucent retained
discretion to declare employee surpluses does not upset the
conclusion that the program itself required minimal
administration.  <u>See</u> <u>White v. Bell Atl. Yellow Pages</u>, No. 01-
10157, 2004 WL 594957, at *9 (D. Mass. Mar. 23, 2004) (allowing
summary judgment for defendant in case involving similar program

21

where employer retained discretion to declare surpluses in target departments).

Paragraph 5 of the MOA is more complex.  Even if one does not view the SPB as the centerpiece of the package -- though it certainly was for these plaintiffs -- almost all of the components are simple, one-time incentives (e.g., a one-time Social Security reimbursement, a transition payment, education benefits).  Others merely vest benefits contained in the underlying retirement plans sooner (e.g., the five year age and service pension credit and early vesting of long term savings).  Cf. Connor II, 251 F.3d at 269 (holding that minor change to an existing ERISA Plan which triggered disbursements sooner because of a credit enhancement did not implicate ERISA because its application was mechanical).  Continuation of the certain insurance benefits for one year and the ability to roll the cash payments into an IRA do not strike the Court, in light of the above holdings, as the sort of ongoing administrative programs that would shift the MOA into the ambit of ERISA.  Certainly, none of the benefits involve the sort of ongoing discretion as to eligibility at issue in Simas.  Notably, the court in Fici v. Lucent Techs., Inc., 581 F. Supp. 2d 143, 151-52 (D. Mass. 2008), concluded that the MOA was not an ERISA plan.  After trial, I agree.

A finding that the LCTOP and paragraph 5 of the MOA do not constitute ERISA plans does not mean that the defendants are off

the hook.  Plaintiffs argue that they were owed fiduciary duties
as participants in the underlying pension plan, which was
unquestionably an ERISA plan, and that these duties included an
obligation not to make misrepresentations about amendments to the
plan, including those described in paragraph 5 of the MOA.

In <u>Balestracci v. Nstar</u>, 449 F.3d 224 (1st Cir. 2006), the
First Circuit considered whether ERISA law applied to plaintiffs'
claims against their former employer challenging the termination
of post-retirement dental insurance coverage.  <u>Id.</u> at 227.  In
1997 and 1999 the defendant implemented two different Personnel
Reduction Programs (PRPs), which took the form of benefit
incentives for employees deciding to retire ahead of schedule.
Before the establishment of the PRPs, the company had provided
all retirees with dental benefits, and the PRPs extended limited
coverage to those deciding to retire early under the plans.  The
1997 PRP, for example, extended dental benefits to all eligible
early retirees "providing they pa[id] ten percent (10%) of the
premium" until they reached age sixty-two, at which point the
company would pay 100% of the premium.  <u>Id.</u>  The 1999 PRP
specified that for those employees accepting the Voluntary
Severance Program who were eligible for post-retirement benefits,
"[c]overage will continue to employee and eligible dependents."
<u>Id.</u>  In December 2002, the company informed participants in both
PRPs that their dental benefits would be discontinued once they
reached the age of 65, if they had not already reached that age

by April 1, 2003. Id. The plaintiffs sued, claiming that the
employer had violated ERISA by discontinuing vested benefits or,
if benefits were not vested, by failing to "discharge [its
fiduciary] duties with respect to a plan solely in the interest
of the participants and beneficiaries." Id. (quoting 29 U.S.C. §
1104(a)(1))(internal quotation marks omitted).

Before deciding whether the dental benefits were vested, the
First Circuit had to consider whether ERISA law applied. The
company argued that because the First Circuit had already held in
O'Connor II that the same 1997 PRP was not an ERISA plan, claims
regarding benefits owed under the PRPs did not implicate ERISA.
Id. at 229 (citing O'Connor II, 251 F.3d at 265-68). The court
found O'Connor II inapposite. It explained that "[w]hether the
[PRPs] themselves constitute ERISA plans, or whether they concern
preexisting ERISA welfare benefits, is beside the point. The
plaintiffs' claims are about dental benefits under an ERISA plan
and ERISA." Balestracci, 449 F.3d at 228-29. The court went on
to examine whether the dental benefits required the kind of
discretionary oversight characteristic of an ERISA plan, but this
analysis did not focus on the amendments as separate from the
underlying, preexisting ERISA-covered dental plan. See id. The
plaintiffs were owed fiduciary duties under the pre-existing
ERISA plan, and they had a viable claim for a breach of these
duties even if their claim involved plan changes that were not,
on their own, covered by ERISA.

Though paragraph 5 of the MOA is not itself an ERISA plan, it clearly amends one. On its face, Lucent intended for the MOA to be a modification of the parties' existing retirement plans, which are covered by ERISA. (Ex. 26, ¶ 9 (noting that "this Memorandum of Agreement will supplement the existing 1998 National Memorandum of Understanding between the parties, as well as the applicable local collective bargaining agreements, the terms of which shall remain in full force and effect, as supplemented by the provisions set forth herein.").) Significantly, as opposed to LCTOP benefits, paragraph 5 benefits were paid out of the ERISA-covered pension account, and in this way impacted the benefits workers received under the ERISA plan.(See Ex. 26, ¶ 5.)  For these reasons the Court finds that to the extent that plaintiffs claims relate to alleged misrepresentations regarding paragraph 5 benefits that were paid out of the ERISA plan, these claims are properly cognizable under ERISA. See Mullins 23 F.3d 663, 666 (2nd Cir. 1994)("ERISA applies if the [severance plan] amended an existing ERISA plan or itself constituted a new ERISA plan.").

This analysis is consistent with the First Circuit's holding in O'Connor II.  In that case, the First Circuit did not directly address whether a retirement incentive that amended an underlying ERISA plan gave rise to ERISA duties.  Although some of the provisions or benefits in O'Connor II may have amended an underlying ERISA plan, the court's analysis focused on the

25

considerable severance bonus, which was the "meat and potatoes" of the plan and was paid out of the defendant's general assets as opposed to an ERISA covered pension account. See O'Connor II, 251 F.3d at 267; Brief of Plaintiffs-Appellants at 22, O'Connor v. Commonwealth Gas. Co., 251 F.3d 262 (1st Cir. 2001)(Nos. 00-1798, 00-1799). Even if some of these other benefits, which included a pension credit, reimbursements for educational and outplacement assistance, and payment of COBRA premiums, implicated ERISA to some extent, they did not "transform the PRP as a whole into an ERISA-protected plan." Id. at 269-70.

Although case law in this area is difficult and tangled, a reasonable reading of First Circuit law provides that retirement incentives that amend ERISA plans may implicate ERISA law duties even if the incentives are not stand-alone plans. First, the court's ruling in O'Connor II predated Ballestracci, which unlike O'Connor II, addressed a question similar to the issue here. Second, an alternative rule would confront plaintiffs like those in this case, who may have been misled by misrepresentations about retirement incentives paid out of an ERISA plan, with the "Catch-22"[7] of not providing a federal claim under ERISA while still preempting state law claims because they are "relate[d] to"

_____

[7] A similar problem confronted plaintiffs in Felix v. Lucent Tech. Inc.,387 F.3d 1146 (10th Cir. 2004), which found that the plaintiffs did not have a viable federal claim under ERISA and remanded to state court for a determination of whether state law claims were preempted. See id. at 1158-61.

an ERISA plan. 29 U.S.C. § 1144(a); see Varatanian v. Monsanto
Co., 14 F.3d 697, 702 (1st Cir. 1994)("To hold that [plaintiff's
state law claims] are preempted by ERISA, and that he has no
standing to assert his claims under ERISA, would clearly
frustrate Congress's intention to remove jurisdictional and
procedural obstacles to such claims.").

2. **Standing**

Along with demonstrating that ERISA law applies, the
plaintiffs must establish that they have standing to bring a
private cause of action under ERISA. See Mullins, 23 F.3d at 666-
67 (explicating the same two-step analysis in a similar case).

The plaintiffs bring one of their claims under §
502(a)(1)(B),[8] which allows ERISA plan participants to recover
the benefits "due to [them] under the terms of [their] plans." 29
U.S.C. § 1132(a)(1)(B).  They argue that First Circuit precedent
in Varatanian provides them with standing to sue under this
provision for paragraph 5 benefits, even though they were not
owed these benefits under the terms of the plan under which they
retired.

---

[8] Because the plaintiffs have a viable 502(a)(1)(B) claim,
they do not have a claim for equitable relief under §  502(a)(3),
29 U.S.C. § 1132(a)(3). See LaRocca v. Borden, Inc., 276 F.3d 22,
29 (1st Cir. 2002)("[F]ederal courts have uniformly concluded
that, if a plaintiff can pursue benefits under the plan pursuant
to Section a(1), there is an adequate remedy under the plan which
bars a further remedy under Section a(3).").

In <u>Vartanian</u>, the plaintiff worked for the employer-defendant for 37 years and was a participant in the Monsanto Company Salaried Employees Pension Plan ("1986 Plan"), which allowed retiring employees to request lump sum distributions of their pension accounts. <u>Vartanian</u>, 14 F.3d at 698. The plaintiff requested a lump sum distribution in March 1990 in anticipation of a May 1, 1991 retirement. <u>Id.</u> In early 1991, the plaintiff began hearing rumors that the employer was considering implementing a more generous retirement package. <u>Id.</u> Over the course of a few months he asked his supervisors whether these rumors were founded. <u>Id.</u> at 699. At that point the employer had already seriously contemplated staff reductions and retirement incentives, including the formation of the Monsanto Special Voluntary Retirement Plan ("1991 Plan"), but they told the plaintiff that they could not speculate on future policy changes. <u>Id.</u> The plaintiff retired on May 1, 1991, and the employer announced the formation of the 1991 Plan on June 28, 1991. <u>Id.</u> The plaintiff sued under ERISA Section 502, 29 U.S.C. § 1132, seeking to recover the benefits he would have received had he been eligible for the 1991 Plan. <u>Id.</u>

The court held that even if Vartanian was not formally a participant in the 1991 Plan, he nonetheless had standing to "recover benefits due to him under [its] terms," 29 U.S.C. § 1132(a)(1)(B), as long as he could show that he would have been a participant "but for" the defendant's alleged wrongdoing.

28

<u>Vartanian</u>, 14 F.3d at 702. The holding was grounded in "Congress's intention to remove jurisdictional and procedural obstacles" to the enforcement of ERISA's remedial measures. <u>Id.</u> at 702. The court had no doubt Congress intended to extend ERISA's protections to people in Vartanian's situation: "At the time of the alleged misrepresentations, Vartanian was a 'participant' in the 1986 Plan, and as such, the administrators of the plan had a fiduciary duty not to mislead Vartanian as to the prospective adoption of a plan under serious consideration. Vartanian's claims thus fall squarely within the 'zone of interests' ERISA was designed to protect." <u>Id.</u> (citations omitted).

Similarly, plaintiffs can bring a § 502(a)(1)(B) claim for the benefits they would have been owed under paragraph 5 but for Lucent's alleged wrongdoing. Under the plaintiffs' theory of this case, Lucent's wrongdoing deprived them of their eligibility for paragraph 5 benefits. Had they known about paragraph 5 benefits and the likelihood they would extend to voluntary retirees in the future, they claim they would not have retired and would have become eligible for these benefits when they were ultimately extended. An employer cannot defeat its "employee[s'] right to sue for breach of a fiduciary duty" through its own malfeasance. <u>Vartanian</u>, 14 F.3d at 702.

Because the terms of the plan, as amended by paragraph 5, plainly did not extend benefits to voluntary retirees in their

situation, the four plaintiffs in the instant case do not have standing under § 502(a)(1)(B) to claim the benefits they would have received had they been involuntarily laid off on the same dates as when they retired. <u>See</u> <u>Todisco v. Verizon Communications, Inc.</u>, 497 F.3d 95, 102 (1st Cir. 2007). They do have standing under § 502(a)(1)(B), however, to seek the benefits they <u>would have been</u> entitled to had they remained Lucent employees past the date when paragraph 5 benefits were extended to voluntary retirees.

## 3. <u>Lucent's Duties under ERISA</u>

The remaining question is what duties the defendants owed plaintiffs vis-à-vis paragraph 5 benefits. The defendants had a duty not to affirmatively mislead participants about the plan as it existed. <u>See</u> <u>Varity Corp v. Howe</u>, 516 U.S. 489, 506 (1995). Regarding information about future plan changes, in <u>Varatanian</u>, the First Circuit found that employers also had a fiduciary duty not to mislead participants "as to the prospective adoption of a plan under serious consideration." <u>Id.</u> at 702 (citing <u>Berlin v. Mich. Bell Tel. Col</u>, 858 F.2d 1154, 1163-64 (6th Cir. 1988)).

Additionally, the defendants had a duty to disclose "material facts affecting the interest of the beneficiary which [it knew] the beneficiary [did not] know and which the beneficiary [needed] to know for his protection." <u>Bendaoud v. Hodgson</u>, 578 F.Supp.2d 257, 278 (D. Mass. 2008)(Gertner,

J.)(quoting Restatement (Second) of Trusts § 173, cmt. d
(1959))(internal quotation marks omitted).  However, this duty
was circumscribed.  In <u>Watson v. Deaconess Waltham Hosp.</u>, 298
F.3d 102 (1st Cir. 2002), the First Circuit explained that there
are two limitations on an ERISA fiduciary's affirmative duties to
disclose material plan information to participants: "First, a
duty only arises if there was some particular reason that the
fiduciary should have known that his failure to convey the
information would be harmful. . . [And] [s]econd, fiduciaries
need not generally provide individualized unsolicited advice."
<u>Id.</u> at 114-15.  Moreover, a fiduciary does not have to be
"perfectly prescient as to all future changes in employee
benefits." <u>Mullins</u>, 23 F.3d at 669.

     The Court need not define the precise contours of the duties
the defendants owed in this case.  As stated earlier, even if the
defendants breached any of these duties, the breach did not cause
harm to these four plaintiffs because they would have retired
voluntarily under LCTOP regardless of any changes effected by the
paragraph 5 benefits, which initially extended only to
involuntary layoffs.  These plaintiffs were so senior they did
not view themselves at risk of being laid off in the foreseeable
future and so felt those enhanced benefits for involuntary
layoffs would not likely have applied to them.  <u>See</u> <u>Gavoni v.</u>
<u>Bricklayers, Masons & Plasterers International Union</u>, 732 F.2d
250, 252 (1st Cir. 1984) (holding that plaintiffs must show "some

significant reliance upon or possible prejudice flowing" from the alleged deficiency).  Also, to the extent that plaintiffs claims relate to future changes to a plan, there is no evidence that the extension of these benefits was under serious consideration at the time the plaintiffs retired.

With respect to the remaining twenty-three claims, the Court must examine the seniority of each plaintiff; the timing of the decision to extend benefits to paragraph 5 benefits to voluntary retirees; and whether the defendants' (and the union's) minimal and generalized disclosures sufficiently and accurately informed employees of present and likely future paragraph 5 benefits.

## 4. Preemption of State Law Claims

Plaintiffs state law claims are preempted.  Section 514 of ERISA expressly preempts all state laws "insofar as they . . .relate to any employee benefit plan." 29 U.S.C. § 1144(a).  A law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Ingersoll-Rand v. McClendon, 498 U.S. 133, 139 (1990).

Judge Young's ruling that the plaintiffs' state law claims are preempted, see Arivella v. Lucent Technologies, Inc., 623 F.Supp.2d 164, 180 (D. Mass. 2009), is the law of the case, and the Court finds no reason to disturb it at this time.  The plaintiffs state law claims are fundamentally connected with an employee benefit plan; if the plaintiffs were successful in their

claims, a court would compute damages in reference to the ERISA benefits promised under paragraph 5 of the MOA, which amends an ERISA plan and calls for benefits to be disbursed out of an ERISA covered pension account. See <u>Carlo v. Reed Rolled Thread Die, Co.</u>, 49 F.3d 790, 794 (1st Cir. 1995)(finding that plaintiffs state law claims that employer had fraudulently misrepresented the benefits he was owed under an ERISA-covered early retirement plan were preempted by ERISA).

**ORDER**

With respect to these four plaintiffs, the Court finds in favor of the defendants.  The parties shall propose mediation and a trial plan for the remaining plaintiffs by January 15, 2011. The Court suggests that the parties agree to a master to make the fact findings for the other plaintiffs.


 /s/ PATTI B. SARIS
Patti B. Saris
United States District Judge